[Civ. No. 24708. Second Dist., Div. Three. May 18, 1961.]

GRUNWALD-MARX, INC. (a Corporation), Respondent, v. LOS ANGELES JOINT BOARD, AMALGAMATED CLOTHING WORKERS OF AMERICA (an Unincorporated Association), Appellant.

Wirin, Rissman, Okrand & Posner, A. L. Wirin, Fred Okrand, Robert R. Rissman and Jacob Sheinkman for Appellant.

Hill, Farrer & Burrill, Hyman Smith and Ray L. Johnson, Jr., for Respondent.

VALLÉE, J. — Appeal by defendant, Los Angeles Joint Board Amalgamated Clothing Workers of America, called "Union," from a judgment awarding money damages to plaintiff, Grunwald-Marx, Inc., called "Company," for breaches of contracts and from an order denying a motion for new trial. The latter order is not appealable and that appeal will be dismissed.

Contractual negotiations between Company, a shirt manufacturer, and Union began sometime prior to 1947. On October 1, 1953, a written collective bargaining agreement was executed between Amalgamated Group of the Pacific Coast Garment Manufacturers by the individual employer members thereof and Union, which recognized Union as the exclusive bargaining representative of the companies' employees with reference to wages, hours and working conditions. The term of the agreement was three years. Company was one of the signatories of that agreement.

The agreement of October 1, 1953, prohibited strikes, lock-

outs, and work stoppages and dealt with union security, hours of work, protection of employees' average earnings during temporary work changes, vacations, holidays, contribution by employers of a stated percentage of their payrolls to Union's insurance fund, etc. The agreement did not set wage rates.[1]

The agreement provided that all complaints, grievances, or disputes arising between the parties relating directly or indirectly to the provisions of the agreement not settled by negotiations between a representative of Union and a representative of Company be submitted to arbitration.[2]

---

[1]Pertinent provisions of the collective bargaining agreement are:

Paragraph 2: "The Company recognizes the Union as the exclusive bargaining representative of its employees with reference to wages, hours and working conditions."

Paragraph 4 (c): "The Company agrees to make available to the Union such payroll and production records as is reasonably necessary to be inspected in connection with the terms hereof. Such records as are made available to the Union shall be confidential."

Paragraph 6: "In the event that any of the existing operations of the Company are changed or new operations are added, piece rates for such operations shall be mutually agreed upon between the Union and the Company, and shall become effective at the time that the operation is changed or new operation begun." (There was no express provision in the agreement with respect to piecework rates for operations which were not changed or which were not new operations.)

Paragraph 11 (b): "In the case of time workers, the pay for each holiday shall be eight (8) times the employee's current straight time hourly rate. In the case of piece workers, pay for each holiday shall be eight (8) times the individual worker's straight time average hourly earnings."

Paragraph 16: "In the event that there is any change or request for any change in the general level of wages including provisions relating to insurance or retirement in the cotton garment manufacturers industry either party may request a conference for the purpose of considering a change in rates under this Agreement and if the parties cannot agree within a reasonable time the matter shall be referred to arbitration as provided for any other grievance."

[2]The arbitration clause of the collective bargaining agreement of October 1, 1953 reads:

Paragraph 14: "All complaints, grievances or disputes arising between the parties relating directly or indirectly to the provisions of this agreement whether concerning discharges or any other terms thereof shall in the first instance be taken up for adjustment by a representative of the Union and a representative of the Company. In the event that they are unable to adjust the same then such matters shall be submitted to arbitration the arbitrators to be selected as follows:

"Each of the parties shall select one (1) arbitrator within two (2) working days after a request for arbitration is made by one party to the other, in writing. The said arbitrators so selected shall select a third arbitrator and if said arbitrators can not agree upon a third arbitrator within two (2) working days after they have been selected then the third arbitrator shall be a person designated by the American Arbitration

During the period covered by the agreement, piecework rates in the plants of the several employers were negotiated individually between each employer and Union. In the early part of 1954 Company requested a downward adjustment of piecework rates. On October 13, 1954, representatives of Company and Union agreed that piecework rates for the operations in Company's plant would be adjusted commencing November 27, 1954, to achieve a reduction in the average hourly earnings of employees who were Union members and paid on a piecework basis from $1.68 to $1.60 and to eliminate an existing differential in rates applicable to plain and fancy shirts. The existing differential was eliminated. On March 31, 1955, after extensive negotiations during which Union indicated reluctance to put the reduction of average hourly earnings into effect, Company, by letter, made written demand on Union for arbitration of the matter. In the letter, Company named an arbiter and requested Union to designate its arbiter. Union did not answer the letter and it did not appoint an arbiter.

On December 1, 1955, Company filed a petition in the superior court for an order directing arbitration of certain matters in dispute between it and Union. On February 20, 1956, judgment was entered ordering the parties "to arbitrate the controversies now existing between them in accordance with the terms of the contract [the collective bargaining agreement of October 1, 1953]."

In the arbitration proceedings, Union contended the dispute with respect to the agreement of October 13, 1954, was not properly before the arbiters because the arbitration clause applied only to the provisions of the master agreement of October 1, 1953, between the association of employers and Union. Company contended that in any event the court order was binding on the arbiters. The arbiters granted Union's motion to dismiss the matter with respect to the breach of the agreement of October 13, 1954. They expressly stated they voiced no opinion as to the merits of that dispute.[3]

Association upon application by either party. It is understood that the decision of a majority of said arbitrators shall be final and binding upon the parties and both of the parties do hereby agree to conform to the majority decision of said arbitrators immediately upon being notified of the arbitration decision.''

[3]Referring to the dispute with respect to the agreement of October 13, 1954, the arbiters said: ''Not being the subject of either a sub-

The decision of the arbiters to dismiss the matter was communicated to counsel by letter on August 20, 1956. The original complaint in the present action, alleging breach of the oral agreement of October 13, 1954, was filed October 2, 1956. The formal award was issued on March 14, 1957. The award was confirmed on September 12, 1957. The question whether the issue involving the agreement of October 13, 1954, was arbitrable was not raised in the superior court proceeding in which the award was confirmed or in a subsequent appeal. (See *Grunwald-Marx, Inc.* v. *Los Angeles Joint Board,* 52 Cal.2d 568 [343 P.2d 23].)

On May 27, 1957, Union was served with an amended complaint which added a count for breach of a second oral agreement made October 8, 1956. On October 7, 1957, Union moved the court for an order to stay this action pursuant to section 1284 of the Code of Civil Procedure. The motion was denied. As an affirmative defense in its answer, Union pleaded that on October 1, 1953, it and Company had "entered into a written Collective Bargaining Agreement covering wages"; the agreement provided "for the settlement by arbitration of any controversy or dispute arising between the parties dating [*sic*—relating] directly or indirectly to the provisions of" the agreement; and Company had failed to exhaust its arbitration remedies.

### Count I

Count I is for damages for alleged breach of the oral agreement of October 13, 1954, that piecework rates would be adjusted to achieve a reduction in the average hourly earnings of employees paid on a piecework basis from $1.68 to $1.60.

The court found that on October 13, 1954, Union "entered into an agreement, partly written and partly oral, with plaintiff wherein and whereby it was agreed that the piecework rates for the operations in plaintiff's plant would be adjusted commencing November 27, 1954, so that the average earnings of all of the employees of plaintiff who are members of the defendant union and who are compensated on a piecework rate basis would be reduced from $1.68 per hour per employee to $1.60 per hour per employee"; Union was in default in not proceeding to arbitrate the issues, the subject of count I, and had thereby waived its right to invoke the arbitration

mission or of a court order, the matter cannot be arbitrated over the objections of the Union. This being so, we, of course, express no opinions as to the merits.''

procedures set forth in the collective agreement; Company suffered damages of $23,478.42, being the difference between the amounts paid as wages for piecework and what it would have paid had Union performed the agreement plus overpayments Company had made into Union's insurance fund.

Union contends first: The agreement of October 13, 1954, could be enforced only by arbitration, and since Company did not pursue that remedy it may not prevail. Company replies that the dispute arising out of that agreement was not arbitrable and in any event Union waived its right to arbitration.

The collective agreement must be read as a whole and the grievance and arbitration procedure viewed in the light of its purpose. The grievance procedure is designed primarily to cope with questions of "wages, hours of work and conditions of employment." The collective agreement expressly provided: "It is the intent and purpose of the Company and the Union that this Agreement shall promote and improve industrial and economic relationships between the Company and its employees, and *provide for wages,* hours of work and conditions of employment of the employees of the Company." (Emphasis added.)

And it said "All complaints, grievances or disputes arising between the parties relating *directly or indirectly to"* the agreement were to be arbitrated if the representatives did not agree. (Emphasis added.)

Civil Code, section 1642, reads: "Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together." (See *Mayers* v. *Loew's, Inc.,* 35 Cal.2d 822, 826-828 [221 P.2d 26].)

It is settled in this state that as a general rule the question of the existence of an agreement to arbitrate and of the scope of the arbitration permissible thereunder are issues which, in the first instance, the code refers to judicial action. (Code Civ. Proc., § 1282; *Pari-Mutuel etc. Guild* v. *Los Angeles Turf Club, Inc.,* 169 Cal.App.2d 571, 576-581 [337 P.2d 575]. Also see *Lodge No. 12, etc. Machinists* v. *Cameron Iron Works* (5 Cir.), 257 F.2d 467, 470.) The question is one of law. We find nothing in the collective bargaining agreement indicating that the arbitrability of the dispute was to be determined by the arbiters.

The question of arbitrability is a matter of interpretation of the collective bargaining agreement, and that

agreement includes provisions with respect to wages. In our view the provisions of the agreement clearly indicate the parties agreed to arbitrate the very type of grievance that arose in connection with the agreement of October 13, 1954. The broad and comprehensive language employed in the arbitration paragraph of the collective agreement requires the conclusion that the parties intended to reserve for arbitration all issues arising from the agreement and subsequent to its execution. The whole spirit of the collective agreement is that the parties wanted to settle all disputes between them by arbitration. (*Grunwald-Marx, Inc.* v. *Los Angeles Joint Board,* 52 Cal.2d 568, 569, 589-590 [343 P.2d 23]; *Cuneo Eastern Press, Inc., of Pa.* v. *Bookbinders & B. W. U.,* 176 F.Supp. 956, 958-959.)

In *United Steelworkers* v. *Warrior & G. Nav. Co.,* 363 U.S. 574 [80 S.Ct. 1347, 4 L.Ed.2d 1409], the collective bargaining agreement provided that "matters which are strictly a function of management shall not be subject to arbitration" under the grievance procedure. The company contracted out work formerly done by its employees. The company contended the question of contracting out of work fell within the phrase "strictly a function of management." The court stated (4 L.Ed.2d at p. 1417):

"An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage. . . .

"[P. 1419.] In the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, particularly where, as here, the exclusion clause is vague and the arbitration clause quite broad." (Also see *United Steelworkers* v. *American Mfg. Co.,* 363 U.S. 564 [80 S.Ct. 1343, 4 L.Ed.2d 1403]; *United Steelworkers* v. *Enterprise Wheel & Car Corp.,* 363 U.S. 593 [80 S.Ct. 1358, 4 L.Ed.2d 1424].)

*Myers* v. *Richfield Oil Corp.,* 98 Cal.App.2d 667 [220 P.2d 973], says (p. 671): "It has long been the policy in California to recognize and give the utmost effect to arbitration agreements. As stated in *Utah Construction Co.* v. *Western Pacific Ry. Co.,* 174 Cal. 156, 159 [162 P. 631]: 'The policy of the law in recognizing arbitration agreements and

in providing by statute for their enforcement is to encourage persons who wish to avoid delays incident to a civil action to obtain an adjustment of their differences by a tribunal of their own choosing . . . Therefore every reasonable intendment will be indulged to give effect to such proceedings.' This policy is especially applicable to collective bargaining agreements since arbitration under such agreements has been a potent factor in establishing and maintaining peaceful relations between labor and industry. (*Levy* v. *Superior Court,* 15 Cal.2d 692, 704 [104 P.2d 770, 129 A.L.R. 956].)''

We hold that the collective bargaining agreement and the oral agreement of October 13, 1954, constituted a single integrated contract. We think the dispute was one of which the agreement required arbitration. (See *Krug* v. *Republic Pictures Corp.,* 120 Cal.App.2d 593 [261 P.2d 562].)

As we have seen, the trial court found Union was in default in not proceeding to arbitrate the issues which are the subject matter of the first count and had waived its right to invoke the arbitration procedures of the collective bargaining agreement.

Code of Civil Procedure, section 1284, provides that if in any suit brought on any issue arising out of an agreement providing for arbitration, the court on being satisfied the issue is referable to arbitration shall stay the suit until arbitration has been had; ''provided, that the applicant for the stay is not in default in proceeding with such arbitration.''

A party to an arbitration agreement may waive his right to arbitrate. (*Case* v. *Kadota Fig. Assn.,* 35 Cal.2d 596, 606 [220 P.2d 912].) One party to an arbitration agreement may, by dilatory tactics or express refusal to proceed, place himself in such a position that the other party may accede to the implied desire of the former, acquiesce in the abandonment of arbitration and resort to court action. (*Minton* v. *Mitchell,* 89 Cal.App. 361, 370 [265 P. 271].)

Whether there has been a waiver is usually a question for the trier of fact. (*Local 659, I.A.T.S.E.* v. *Color Corp. of America,* 47 Cal.2d 189, 196 [302 P.2d 294] ; 51 Cal.Jur.2d, § 9, p. 319.)

The facts in *Local 659, I.A.T.S.E.* v. *Color Corp. of America, supra,* were like those at bar. The court stated (p. 194) :

''Section 1280 of the Code of Civil Procedure provides that a provision in a written contract to settle by arbitration

a controversy arising out of the contract or the refusal to perform the whole or any part thereof 'shall be valid, enforcible and irrevocable, *save upon such grounds as exist at law or in equity for the revocation of any contract*' (emphasis added). It is thus indicated that there may be instances in which the right to enforce an arbitration provision is lost. This is further shown by other provisions. A party aggrieved by the failure or refusal of another to perform under a contract providing for arbitration may have the provision enforced by the court; the court shall hear the matter and on being satisfied the failure to comply with the arbitration 'is not in issue' shall order the arbitration to proceed; if 'default' be in issue, that shall be tried. (*Id.*, § 1282.) If any action be brought on the issue arising out of the contract for arbitration the court shall stay the action upon being satisfied that the issue is referable to arbitration provided the 'applicant for the stay is not in default in proceeding with' the arbitration. (*Id.*, § 1284.) It is also evident that defendant could have proceeded to enforce the provision for arbitration under the code when petitioner refused to arbitrate.

 "In harmony with the arbitration statute, *supra,* it has been held . . . [citations] . . . that a failure by a party to proceed to arbitrate in the manner and at the time provided in the arbitration provision is a waiver of the right to insist on arbitration as a defense to an action on the contract. . . .

"[P. 195.] 'Although one party can not by himself "rescind" a contract, he can wrongfully "repudiate" it. What is the effect of his repudiation? To answer this, we must first interpret his expressions and determine the coverage of the repudiation. Suppose first that he repudiates the agreement to arbitrate itself. By such a repudiation he does not deprive the other party of his right to arbitration; and if the repudiator brings an action in breach of his valid arbitration agreement the defendant can defend on the ground that arbitration is a condition precedent, or under a statute can obtain a stay or an order to arbitrate, or can counterclaim for damages. But such a repudiator has himself no right to arbitration. The other party can now bring his action in reliance on the repudiation, or otherwise change his position in reliance. Thereafter, the repudiator has no power of retraction and can not insist on the remedy by arbitration. . . .'

. . .

"[P. 197.] In the instant case it appears that the dispute under the collective bargaining agreement arose in August, 1954 between petitioner and all the other unions and the other unions commenced the grievance and arbitration procedure. Petitioner, however, refused to participate. The dispute with all the unions was exactly the same, whether dismissal pay was to be paid under the contract. In the same month petitioner complained to the state labor commissioner that pay (dismissal pay) was being withheld contrary to section 222 of the Labor Code, *supra,* and the commissioner issued his order for a hearing on that subject. On September 29th petitioner, by Aller, wrote the letter to defendant heretofore quoted and it was in response to a demand that petitioner arbitrate. While not too clear, that letter is readily susceptible of the construction that petitioner did not wish to arbitrate but preferred to proceed before the labor commissioner. In any case, Stone's affidavit shows that defendant's repeated demands on petitioner, both before and after the letter, that it arbitrate had been refused and after the letter he informed Aller that petitioner's repudiation of the arbitration provision and refusal to arbitrate was a breach of the contract and defendant would 'no longer consent' to arbitration. There is some conflict on the matter by reason of Aller's affidavit but the resolution of that conflict was for the trial court. Even if the letter did not constitute an unequivocal refusal to arbitrate, Stone's affidavit shows other unequivocal refusals and defendant's acceptance thereof. For the same reason it is not necessary to consider the proceeding before the labor commissioner; there is sufficient without it. Aller in his letters to Stone of January 11, 1955, and thereafter indicated a desire to arbitrate, but we take it from Bernstein's and Stone's affidavits that there had before then been a repudiation of the arbitration provision and acceptance thereof by defendant. Indeed, it may well be concluded from those affidavits that there was a mutual rescission of the provision for arbitration.

 "A repudiation of a contract accepted by the promisor excuses performance by the promisee. [Citations.] And it is said in *Dessert Seed Co.* v. *Garbus,* 66 Cal.App.2d 838, 847 [153 P.2d 184] : 'It is well settled that an abandonment of a contract may be implied from the acts of the parties and this may be accomplished by the repudiation of the contract by one of the parties and by the acquiescence of the

other party in such repudiation. This doctrine is supported by many cases. [Citations.]

" 'In support of the court's findings and judgment, the evidence would warrant a conclusion that there had been a mutual abandonment or rescission of the oral contract.' "

Where the agreement provides for arbitration of disputes, it is no objection to the plaintiff's right to sue if he has made written demand on the defendant for arbitration, and when repeated it was entirely ignored by the defendant. (*Tubbs* v. *Delillo*, 19 Cal.App. 612, 617 [127 P. 514].)

As stated earlier, on December 1, 1955, Company petitioned the superior court for an order directing arbitration but, as held by the arbiters did not include in the petition failure of Union to adjust piecework rates to $1.60. Company learned of the arbiters' decision with respect to this dispute about August 20, 1956. At the time Company brought this action on October 2, 1956, performance by Union of the October 13, 1954, agreement was two years overdue. It was not shown that despite Union's delay, Company could have adjusted the piecework rates to $1.60. Despite the demand that Union name an arbiter, its representatives had taken no action. The court could reasonably infer from the conduct of the representatives of Union, as shown by the evidence related, that it could not or would not perform its obligation to arbitrate. At the opening of the arbitration proceeding, Company offered a written submission agreement to Union. This agreement was an offer to submit the dispute respecting the agreement of October 13, 1954, to the arbiters. Union refused to submit the issue to the arbiters, contending it was not arbitrable at all. This we think constituted an unequivocal repudiation of the arbitration clause. The trial court could reasonably conclude that in addition to its failure to name an arbiter, Union had expressly refused to submit the dispute to arbitration. Company, relying on the repudiation by Union, acquiesced therein by filing this action. (See *Gold Min. & Water Co.* v. *Swinerton*, 23 Cal.2d 19, 29-30 [142 P.2d 22]; *Walker* v. *Harbor Business Blocks Co.*, 181 Cal. 773, 780-781 [186 P. 356].)

The finding that Union was in default in not proceeding to arbitrate the issues the subject of count I and had thereby waived its right to invoke the arbitration procedures is supported by substantial evidence.

Union asserts next: The agreement of October 13,

1954, did not constitute a binding contract because it was not self-executing; it required further negotiation and agreements between the parties as to which piecework rates were to be adjusted. Company says it was the duty of Union to adjust the piecework rates so as to effect the reduction and the adjustment was not subject to further negotiations; the trial court so found; and the finding is supported by substantial evidence.

Mr. Grunwald, president of Company, testified Union was to have the only part in adjusting the piecework rates to $1.58. He testified further: The manager of Union, at the October 13, 1954, meeting, said, "We will adjust the wages to $1.58"; " 'I [manager of Union] would add a little bit to this operation in order to have it look like a readjustment, and take off this operation more,' and so on, 'in order to add a little bit here and add a little bit there, but as the total, it should be reduced to $1.58' "; "it was established that it should be readjusted to $1.58, and this $1.58 was the figure which was agreed upon, and it was just a question to go and figure out the mathematical figure, how many cents this adjustment makes on a dozen shirts, and then to split it up among the different operations. That was the agreement and nothing else."

Mr. Elstein, attorney representing Company in the negotiations, testified that about November 2, 1954, Mr. Roitman, business agent of Union, submitted some figures which did not bring the average down to $1.58 or $1.60. Mr. Elstein testified further: "Q. Well, if there was an agreement, why was it necessary to have further discussions about it? A. Because it was not being put in effect. Q. By the company? A. Well, the particular rates, in order to accomplish the bringing about of the reduction to the $1.58, had never been set by the union that would bring it down to that figure."

At a meeting between the parties in November 1954 Company pressed Union to effect the reduction. Mr. Talpis, vice-president of Company, testified that at that meeting, Mr. Posner, manager of Union, said that: "the union would eliminate the difference in prices that we paid between the so-called staple and fancy shirts; that he would see that we got one uniform rate; that the premiums that we were paying on so-called short bundles would be eliminated. Then after this uniform rate was established, that he would allow or that a period of four weeks' trial period would ensue, to see how

this affected the average earnings of the girls, and that if it came out that the girls were making an average earning of more than $1.58, that he would roll back the wages so that they would earn $1.58 per hour.'' Mr. Talpis testified that at another meeting in January 1955 Mr. Posner repeated the statement he made at the November 1954 meeting.

On January 20, 1955, Mr. Posner wrote Mr. Talpis (Exhibit 7):

"This is to confirm our conversation where we agreed to put in one price in Long Beach after the meeting of the shop on the 19th of January.

"We will leave that price in for 30 days and then take a record of the average and see what it shows. After that if there are any inequities we will try to adjust it to bring the average down from $1.58 to $1.60.''

Mr. Talpis testified further: "Q. I show you a document and will ask you if you recognize it or can identify it for us. A. Yes. This was the letter that—— Mr. Johnson: I want to identify this as Plaintiff's Exhibit 7 that I am showing the witness. A. This is the letter that Mr. Posner wrote to me to confirm the agreement that we had come to in their offices, as a result of that last meeting in January. Q. Does that correctly state the agreement? A. Well, not exactly. He says here in his last sentence—it says after that, if there are any inequities, we will try to adjust it to bring the average down from $1.58 to $1.60. He mentions in there—he says, we will try to adjust it. The understanding that I had, and that George—let me say, the understanding that George Elstein and I had was that it was a definite thing. Q. Not your understanding. Was it ever stated that the price would go into effect? A. It was stated that it would go into effect after this 30-day trial period. Q. Who made that statement? A. Mr. Posner made that statement. Q. Were the piece-work rates of Grunwald-Marx covering members of the defendant union ever adjusted to an average earning of $1.58? A. No.''

In the latter part of January 1955 Mr. Posner eliminated the differential between plain and fancy shirts. There was evidence he refused to put the adjustment to $1.58 (found by the court to be $1.60) into effect.

The finding that Union had at all times refused to adjust the piecework rates is an implied finding that adjustment of the rates to effect the plant-wide reduction agreed on was the duty of Union and was not subject to further negotiation.

The implied finding was that under the agreement Union could have made the adjustment in any manner it determined so long as the total plant-wide reduction was that which had been agreed. The finding, in effect, was that Union was not required to give Company a voice in how the reduction would be accomplished. It is supported by substantial evidence. There was evidence from which the court could have found to the contrary. Resolution of the conflict was for the trial court, not this court. Our duty stops when there is some substantial evidence supporting a finding.

Union asserts the payments made by Company over and above $1.60 an hour average are not recoverable. The agreement of October 13, 1954, was effective November 27, 1954. From that date to September 30, 1956, Company paid the employees at the rates which were in effect on October 13, 1954. The argument is that the payments were voluntary and that Company's damages were not proximately caused by Union's breach but resulted from its own acts.

Union did not plead or raise this issue in the trial court.[4] As has been said many times, it is the general rule of appellate review, early established and long adhered to, that issues not raised in the trial court will not be considered on appeal. The effect of the rule is to prevent a party from asserting on appeal matters of defense not presented to the trial judge. (3 Cal.Jur.2d § 140, p. 604.)

Union contends a written agreement of October 8, 1956, discussed later, rescinded the oral agreement of October 13, 1954, and cancelled any claim for damages thereunder. It says there was no reservation of any claimed right to damages under the agreement of October 13, 1954, when the agreement of October 8, 1956, was entered into. The point is also made

[4]The pretrial order stated that "The issues are embraced within the contentions of the respective parties." The contentions stated by Union in a "Stipulation and Joint Pre-trial Statement of Plaintiff and Defendants" were: 1. denial of all material allegations of the complaint and that an agreement was entered into as alleged in counts I and II; 2. the National Labor Relations Board had exclusive jurisdiction; 3. Company had not exhausted its arbitration remedies, and no justification therefor had been pleaded. Issues not raised at the pretrial conference and not listed in the pretrial order as issues in dispute are not issues in the case, where there was no request for modification of the pretrial order. (*Dell'Orto* v. *Dell'Orto*, 166 Cal.App.2d 825, 829-831 [334 P.2d 97].) The only modification of the pretrial order was leave granted Union at the trial to amend its answer to plead the statute of frauds, which was done.

for the first time on appeal and need not be considered. Furthermore, Company had reserved its rights under the agreement of October 13, 1954, by filing this action for its breach on October 2, 1956.

## Count II

This action was filed October 2, 1956, stating one count for breach of the agreement of October 13, 1954. On May 24, 1957, Company filed an amended complaint adding a second count. Count II is for damages for alleged breach of an oral agreement of October 8, 1956, that piecework rates would be adjusted to effect a reduction of 50 cents a dozen shirts on December 15, 1956, and a second reduction of an additional 50 cents a dozen shirts on January 5, 1957. Judgment was for plaintiff for $29,070.51, being the difference between the amounts paid as wages for piecework and what it would have paid had Union performed the agreement plus overpayments it had made into Union insurance fund.

Prior to September 1956 Company had been negotiating with Union for an entirely new piecework rate structure to be established by using a base rate to which varying amounts would be added for the different operations as a result of motion-time measurement studies of them. About September 11, 1956, a meeting was held between Mr. Posner and Mr. Grunwald in which it was agreed that on termination of the collective bargaining agreement on September 30, 1956, new piecework rates should be put into effect in Company's plant established on a base rate plus motion-time measurement studies. The base rate was to be $1.28. According to normal engineering practices, plus incentive plan, this would give the normal girl, working at normal speed, an earning power of $1.70 an hour. In August or September 1956, National Cotton Garments Association negotiated a 10-cent average hourly increase of wages to be effective nationally. The new piecework rate structure was designed to include this increase. The plan was acceptable to Mr. Posner. It was subject to approval of the piece-rate workers at the plant. They approved the plan on September 19, 1956. The plant was completely engineered by industrial engineers in accordance with the plan. On September 28, 1956, Company informed the employees the new rates would be effective on October 1, 1956. A strike ensued on October 1, 1956, and the plant was shut down.

The collective bargaining agreement of October 1, 1953,

contained a provision that it should be automatically renewed after September 30, 1956, unless 60 days prior thereto notice in writing was given by either party of its desire to make changes or of its intention to terminate the same.[5] There was no evidence that a 60-day notice in writing was given by either party to the other.

On October 8, 1956, agreement was reached between Company and Union. Company orally agreed to extend the prior collective bargaining agreement for an additional three years, to put into effect on November 5, 1956, the 10-cent an hour wage increase which had been negotiated by National Cotton Garments Association, and to reinstate an employee who had been discharged. Union orally agreed to return the employees to work and to effect a reduction in piecework rates of 50 cents a dozen shirts on December 15, 1956, and a second reduction of an additional 50 cents a dozen shirts on January 15, 1957. On the same day Mr. Grunwald signed a "letter or slip" to the effect that he would sign the agreement extending that of October 1, 1953, for an additional three-year period. The employees returned to work on October 9, 1956.

On October 13, 1956, a written agreement was executed providing that the agreement of October 1, 1953, "be extended to September 30, 1959, and that all of the [its] terms and conditions be deemed a part of this agreement" with exceptions not relevant to the issues at bar. The part of the oral agreement of October 8 with respect to the 10-cent average hourly increase and with respect to the reductions of 50 cents for each dozen shirts on December 15, 1956, and January 15, 1957, were not incorporated in the writing. On October 30, 1956, a Union representative orally reconfirmed the agreement with respect to the reductions to be effective in December and January. The 10-cent an hour across-the-board increase in wages was put into effect on November 5, 1956. Union did not put the 50-cent reductions into effect. Mr. Talpis testified it "was the union's job, to put in the 50¢, to apply it to the various operations, wherever they were

---

[5]This provision read: "This agreement shall be effective upon the date hereof and shall remain in full force and effect until September 30, 1956. It shall be automatically renewed from year to year thereafter unless sixty (60) days prior to the expiration of this Agreement or of any renewal thereof, notice in writing by registered mail is given by either party to the other of its desire to propose changes in the Agreement or of intention to terminate the same, in which event this Agreement shall terminate upon the expiration date next following said notice."

going to apply it." In May 1957 Company closed its plant and established its operations in Phoenix, Arizona.

The court found the parties did not agree to arbitrate any dispute or controversy arising out of the agreement of October 8, 1956. This finding is inconsistent with the court's finding with respect to arbitrability of the agreement of October 13, 1954.

The court also found that Company in exchange for, and in consideration of, Union's oral agreement of October 8, 1956, agreed to extend the collective agreement of October 1, 1953, for an additional period of three years. This finding is supported by the evidence.

Union contends the dispute with respect to the agreement of October 8, 1956, was arbitrable; Company did not seek arbitration; hence the judgment as to count II must be reversed. Company says the dispute was not arbitrable.

Company says that Union "cannot isolate piece rates in the 1956 agreement from the entire agreement of the parties." In other words, piecework rates were part and parcel of the collective bargaining agreement. The written agreement of October 8, 1956, extending the agreement of October 1, 1953, and the oral agreement of October 8, 1956, to reduce piecework rates 50 cents a dozen shirts on December 15, 1956, and again on January 15, 1957, constituted a single integrated contract. For the reasons we have stated with respect to the arbitrability of the agreement of October 13, 1954, we hold the finding that the parties did not agree to arbitrate any dispute arising out of the agreement of October 8, 1956, is unsupported. It follows that the dispute which arose with respect to the agreement of October 8, 1956, was arbitrable.

Company made no effort to arbitrate the dispute arising out of the agreement of October 8, 1956. When the complaint was amended to add the cause of action with respect to the agreement of October 8, 1956, Union promptly moved to stay the action. Company opposed the motion. When Union applied for the stay it was not in default in proceeding with arbitration. (*Squire's Dept. Store, Inc.* v. *Dudum,* 115 Cal. App.2d 320, 327-330 [252 P.2d 418].) It did not at any time refuse to arbitrate that dispute. The motion was denied; it should have been granted as to the second cause of action.

Where a collective bargaining agreement provides that a dispute be referred to arbitration, either party has a right to arbitrate but, should he desire to litigate, he must

first submit to arbitration and exhaust that remedy. (*Cone v. Union Oil Co.*, 129 Cal.App.2d 558, 563-564 [277 P.2d 464].)

 *Clogston* v. *Shiff-Lang Co., Inc.*, 2 Cal.2d 414 [41 P.2d 555], says (p. 416):

" ' [A]rbitration, or an unsuccessful attempt to secure the same, *is a condition precedent*' to the right to maintain an action for breach of the contract; and that in the absence of arbitration of, or any attempt on the part of the plaintiff to arbitrate, any contractual differences which had arisen between him and the defendant therein, in connection with an asserted cause of action, a judgment rendered in favor of the plaintiff in the action for a breach of the contract should be reversed."

Lastly, Union asserts that exclusive jurisdiction over the parties and the entire subject matter of the action is in the National Labor Relations Board. The point is untenable. We do not think this is a situation where the same acts constituting breaches of contracts were also unfair labor practices. (*Grunwald-Marx, Inc.* v. *Los Angeles Joint Board*, 52 Cal.2d 568 [343 P.2d 23].) The reasoning of the court in that case applies directly to the facts in the present case. No purpose would be served in repeating what is said there.

Since the dispute with respect to the agreement of October 8, 1956, must now go to arbitration, it is unnecessary to discuss other points made by Union with respect to count II.

The appeal from the order denying a new trial is dismissed. The judgment as to count I, the first cause of action, is affirmed; as to count II, the second cause of action, it is reversed. The parties shall each bear half the costs of the appeal.

Shinn, P. J., concurred.

Ford, J., did not participate.

A petition for a rehearing was denied June 15, 1961.