Stephan **RIESS** and Thelma McKinney Riess, Appellants,

v.

C. W. **MURCHISON** and Simi Valley Development Company, Appellees.

No. 20679.

United States Court of Appeals Ninth Circuit.

Oct. 24, 1967.

Morris E. Cohn, Los Angeles, Cal., for appellants.

Stuart Kadison, Kadison & Quinn, Los Angeles, Cal., for appellees.

Before BARNES and DUNIWAY, Circuit Judges, and TAYLOR,* District Judge.

BARNES, Circuit Judge:

This case comes before us for a second time. In a decision reported at 329 F.2d 635, we reversed in part and remanded to the district court, which thereafter stayed its proceedings and ordered the parties to proceed to arbitration. The propriety of that ruling is here at issue.

The jurisdiction of the district court was founded on diversity of citizenship; appellants Riess are citizens of California, while appellee Murchison is a citizen of Texas and the Simi Valley Development Company—the other appellee—is organized under the laws of Delaware and has its principal place of business in Texas. The sum in controversy well exceeds the requisite $10,000 amount. 28 U.S.C. § 1332 (1964).

The case comes to us pursuant to 28 U.S.C. § 1292(b) (1964). On April 11, 1966, the district court certified that the order here at issue involved a controlling question of law as to which there is substantial ground for difference of opinion, and that an immediate appeal might materially advance the ultimate termination of the litigation. C.T. 221–22. On May 11, 1966, this court permitted the appeal.

The factual context into which the questions of this case are set is not uncomplicated, and may perhaps best be set out by referring initially to the summary contained in our previous opinion:

"Stephan Riess and Thelma McKinney Riess (referred to herein as the sellers) entered into a contract with C. W. Murchison, who subsequently assigned to Simi Valley Development Company (referred to herein as the buyers) for the sale of certain real estate, namely: A three and one-half

---

* Hon. Fred M. Taylor, Chief Judge, United States District Court, Boise, Idaho, sitting by designation.

acre parcel of land in the Simi Valley in Ventura County, California, on which were located a number of wells (referred to herein as the water lands) and, in addition, approximately three hundred subdivided lots in the same area (referred to herein as the additional lands).

"The contract consisted of two separate letters from C. W. Murchison to Stephan Riess, dated September 13, 1955, and June 12, 1956, constituting a single integrated agreement, under which: (1) The sellers were to convey the water lands and the additional lands to the buyers on June 12, 1956, (referred to herein as the consummation date). (2) The buyers were to deliver one-sixth of the common stock of the Simi Valley Development Company to the buyers [sic: sellers] on the consummation date. (3) The buyers were to pay the sellers $1,000,000 as follows: $50,000 was to be paid on the consummation date. $24,000 was to be paid in each of the two years immediately following the consummation date. No fixed time was set for payment of the balance; it was to be paid at the rate of ten cents per 1,000 gallons of water produced, saved, and sold from the water lands, provided, however, that if during any year the amount payable at this rate should be less than $24,000, the sellers were to be entitled to take the difference in water at the rate of twenty cents per 1,000 gallons, though if the buyers should elect to pay the difference in money, they might do so. (4) 'Subject to' the physical ability of the water on the water lands to adequately service certain other lands which were owned by the buyers and which were to be developed for residential and commercial uses (referred to herein as the Montgomery lands), the buyers were to build or install a reservoir and pipelines on the water lands to transmit water taken therefrom to the nearest boundaries of the Montgomery lands by June 12, 1958. In case of a disagreement as to the sufficiency of the water on the water lands to adequately service the Montgomery lands, the question was to be submitted to arbitration. (5) The buyers were to have the right at any time to reconvey the water lands to the sellers and terminate the contract and their future obligations thereunder, if, in their opinion, the water on the water lands should no longer be capable of producing water in quantities sufficient to be commercially profitable to them.

"Pursuant to the contract the sellers conveyed the water lands and the additional lands to the buyers on the consummation date. They have performed all the material covenants and conditions on their side of the contract.

"During the fourteen months prior to the consummation date, the buyers paid the sellers $28,000 in fourteen monthly installments of $2,000 each (referred to herein as the voluntary payments). The contract recites that this amount should be a 'credit on the purchase price.' On or about the consummation date, the buyers paid an additional $50,000 to the sellers, and they delivered one-sixth of the common stock of Simi Valley Development Company to the sellers.

"During the fifteen months immediately following the consummation date, the buyers paid the sellers $30,000 in fifteen monthly installments of $2,000 each. Thereafter, the buyers refused to make any further monthly payments, contending that the voluntary payments ($28,000) should be credited against the balance due for the last nine months of the first two year period ($18,000), thereby satisfying such balance and creating an overpayment of $10,000.

"Subsequently, during certain meetings between the sellers and the buyers, and in certain correspondence and conversations between them, concerning future performance by the buyers under the contract, the buyers expressed some unwillingness to comply exactly with the terms of the contract.

Whether the buyers actually repudiated the contract is in dispute.

"The buyers did not build or install the reservoir and pipelines on the water lands by June 12, 1958, as promised, though they did build and install them at a later date before trial. They asserted that the water on the water lands was insufficient to adequately service the Montgomery lands and that, therefore, the condition to their duty to build or install the reservoir and pipelines by that date did not occur.

"The buyers have not paid the sellers at the contract rate for water produced, saved, and sold by them from the water lands, though between the consummation date and the date of trial they did produce, save, and sell water therefrom.

"The buyers have never exercised their right under the contract to terminate the contract for insufficiency of the water on the water lands.

"On October 8, 1958, the sellers brought the present action in the District Court. They demanded a jury trial. At trial they proceeded on the theory that the buyers committed total breach of the contract by failing to perform their duties thereunder and by unequivocally repudiating such duties.

"Before and during the trial, the buyers sought to enforce the contract's arbitration clause. They made a number of motions to stay the proceedings pending arbitration of the question of the sufficiency of the water on the water lands to adequately service the Montgomery lands. The District Court denied such motions on the ground that the question of sufficiency was not material to the case.

"After three days of trial to a jury, during which time Stephan Riess was the only witness, the District Court ruled as a matter of law that at the times here relevant the contract was not susceptible to total breach and that consequently the sellers could recover only their actual damages for partial breach. The amount of the actual damages having been stipulated, the

court held that no issue of fact remained for the jury, and accordingly it dismissed the jury.

"The District Court then proceeded to make findings of fact and conclusions of law. It held that the buyers committed partial breaches of the contract: The court held that the buyers breached by paying only $30,000, instead of $48,000, during the two years immediately following the consummation date; in this connection, it held that the voluntary payments of $28,000 made prior to the consummation date should be credited against monies to become due under the contract after trial, not against the $48,000 due during such first two years. The court also held that the buyers' duty to build or install the reservoir and pipelines on the water lands by June 12, 1958, was absolute, not conditional, and, therefore, that their failure to build or install them by that date constituted a breach, regardless of the sufficiency of the water on the water lands to adequately service the Montgomery lands. The court further held that the buyers breached by failing to pay the sellers at the contract rate for water produced, saved, and sold by them from the water lands.

"With respect to the question of total breach, the District Court held that the contract was not susceptible to total breach at the times here relevant, and it found that even if it had been, still in fact the buyers did not commit total breach, by repudiation or otherwise. Accordingly, the District Court entered judgment for the sellers, but awarded them only actual damages for partial breach." 329 F.2d at 637–639 (footnote omitted).

Our previous decision contained a number of rulings. We held, first, that the district court had erred in denying that the contract was susceptible of total breach; and, further, we characterized as "gratuitous" that court's finding that there had been no total breach—for the reason, among others, that certain evidence relating to that question had been

excluded in accord with the court's position that the contract was not susceptible of total breach. 329 F.2d at 639–640, n. 2. Second, we held that the trial court had been correct in ruling that the voluntary payments were not to be credited against the $48,000 due under the contract during the first two years after the consummation date. Finally, we ruled that the court below had erred in holding that the buyers' duty to build or install the reservoir and pipelines by June 12, 1958, was absolute and unconditional regardless of the sufficiency of the water. We then added:

"Under our holding above, the sufficiency of the water on the water lands to adequately service the Montgomery lands is quite material to the case. Therefore, we further hold that the District Court's denial of the buyers' motions for arbitration, on the ground that the question of sufficiency was immaterial, was erroneous. *If* the present case is one which is otherwise proper for arbitration the buyers are entitled to have the question of sufficiency settled by arbitration. Whether it is such a case must be determined on the facts relative to the buyers' conduct. See Calif.Code Civ.Proc. § 1281; Bertero v. Superior Court, 216 A.C.A. 251, 30 Cal.Rptr. 719 (1963); Jordan v. Friedman, 72 Cal.App.2d 726, 165 P. 2d 728 (1946). And the determination must be governed by the pertinent California cases and statutes for the contract is not one involving commerce[,] 9 U.S.C. §§ 1–3, Bernhardt v. Polygraph Co. of America, 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1955), and the question relates to performance and discharge and, therefore, under the pertinent authorities is governed by the substantive law of California, the place of performance. Erie Ry. Co. v. Tompkins, supra [304 U.S. 64, 58 S. Ct. 817, 82 L.Ed. 1188 (1938)]; Klaxon v. Stentor Mfg. Co., supra [313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)]. Cal.Civ.Code § 1646; see 11 Cal.Jur.2d, 'Conflict of Laws,' §§ 54, 60; Leflar, The Law of Conflict of

Laws, § 130 (1959)." 329 F.2d at 644 (footnote omitted).

Pursuant to this last ruling, appellees on remand again requested the trial court to refer the matter to arbitration. Appellants proceeded to file a third amended complaint, emphasizing the buyers' alleged repudiation of the contract, and appellees then moved for a stay. Hearings followed concerning the propriety of arbitration, at the conclusion of which the district court granted appellees' motion. The court ruled that neither appellee was "in default or otherwise precluded from proceeding with arbitration," and that the case was "otherwise proper for arbitration." C.T. 192–95.

Appellants challenge the correctness of the trial court's order in several respects. Their primary contention, however, is that arbitration is improper because (1) appellees "repudiated" the contract—by asserting, after certain partial breaches, a refusal to perform future obligations— and (2) one who repudiates a contract containing an arbitration clause may not under California law claim the benefit of that clause by requiring arbitration. We reject the second part of this argument, and hold that arbitration was properly ordered.

Admittedly, California law concerning the question here involved is not entirely clear. Counsel have referred us to numerous decisions dealing with the right to claim arbitration. Most are distinguishable from the present case in certain respects. Several, for instance, involve situations in which an arbitration clause itself is specifically repudiated or waived by a party who later seeks to enforce arbitration. E. g., Local 659, Int'l Alliance of Theatrical Stage Employees v. Color Corp. of America, 47 Cal.2d 189, 302 P.2d 294 (1956); Grunwald-Marx, Inc. v. Los Angeles Joint Bd., Amalgamated Clothing Workers, 192 Cal.App.2d 268, 13 Cal. Rptr. 446 (1961).

Most directly in point is a line of cases beginning with Hanes v. Coffee, 212 Cal. 777, 300 P. 963 (1931), which lends support to appellants' contentions. The *Hanes* case involved an oil lease con-

taining an arbitration clause. . Without seeking arbitration the lessor brought suit to quiet title, claiming that the lessee had failed to comply with the requirement under the agreement that work be commenced within two years. The Supreme Court of California affirmed a judgment for the plaintiff, asserting the following with respect to the arbitration clause:

> "Conceding that this provision would be enforceable under our statutes, we do not think that it is applicable to the present controversy, in which the lessor contends that, by reason of failure of the lessee to commence operations within the specified period, the lease never became operative, or, if it did, is now terminated. The provision clearly does not contemplate that this question shall be submitted to arbitration, since if the allegations of plaintiffs' complaint are sustained, the result is that the lease, including the arbitration provision, is wholly inoperative, and the lessee can claim no rights thereunder." 212 Cal. at 779–780, 300 P. at 964.

We note that this is all that is said on this issue, and that no authority, from either California or any other jurisdiction, is cited in support of the holding. A number of cases decided by the district courts of appeal have followed this decision in more or less analogous situations. See Stetson v. Orland Oil Syndicate, 42 Cal. App.2d 139, 108 P.2d 463 (1940); Johnson v. Atkins, 53 Cal.App.2d 430, 127 P. 2d 1027 (1942); Banks v. Calstar Petroleum Co., 82 Cal.App.2d 789, 187 P. 2d 127 (1947); Drake v. Stein, 116 Cal. App.2d 779, 254 P.2d 613 (1953); Wetsel v. Garibaldi, 159 Cal.App.2d 4, 323 P.2d 524 (1958); Ehrhart & Associates, Inc. v. Superior Court, 185 Cal.App.2d 1, 7 Cal.Rptr. 844 (1960).

These decisions, however, cannot be relied upon to settle the question. First, the only state supreme court decision in point is *Hanes* itself—which was decided thirty-six years ago; since that time con-

siderable development has taken place elsewhere in the law concerning the repudiation of agreements to arbitrate. See Annot., 3 A.L.R.2d 383 (1949). Prior to the last quarter-century the generally adhered to rule was that a repudiation of contractual obligations *other* than the obligation to arbitrate a controversy —as well as repudiation of the arbitration agreement itself—worked a forfeiture of the right to require arbitration. Thus, the *Hanes* case reflected the prevailing view at the time that case was decided. This rule was impressively criticized, however,[1] and in 1942 the leading English case of Heyman v. Darwins, Ltd., [1942] A.C. 356, held to the contrary, reversing English precedent. The *Heyman* decision has since been endorsed by several American courts. See, e. g., In re Pahlberg Petition, 131 F.2d 968 (2d Cir. 1942); Batter Building Materials Co. v. Kirschner, 142 Conn. 1, 110 A.2d 464 (1954); DeLillo Constr. Co. v. Lizza & Sons, 7 N.Y.2d 102, 195 N.Y.S.2d 825, 164 N.E.2d 95 (1959).

The decisions following *Hanes*, furthermore, have been seriously undercut by a 1963 California District Court of Appeal ruling (which does not consider *Hanes*). In Swift-Chaplin Productions, Inc. v. Love, 219 Cal.App.2d 110, 32 Cal. Rptr. 758, 5 A.L.R.3d 1001 (1963), it was directly held that the termination of a contract according to its terms did not prevent subsequent arbitration according to the provisions of the agreement. It is difficult to avoid the conclusion that this decision conflicts to a substantial extent with the *Hanes* rationale, under which repudiation of a contract "terminated" the agreement, preventing the repudiator from insisting on arbitration according to its terms. And the language of recent opinions of the state supreme court, as well as various intermediate courts of appeal, indicates at least that the *Heyman* question is an open one in California. This conclusion is strongly suggested by the opinions in Local 659, Int'l Alliance of Theatrical Stage Employees v. Color

---

1. See Kulukundis Shipping Co. v. Amtorg Trading Corp., 126 F.2d 978, 991–992 (2d Cir. 1942) (Frank, J.); 6 S. Williston, Contracts § 1921 (rev. ed. 1938).

Corp. of America, 47 Cal.2d 189, 194–197, 302 P.2d 294, 296–298 (1956), and Bertero v. Superior Court, 216 Cal. App.2d 213, 221–222, 30 Cal.Rptr. 719, 724–725 (1963). Other recent decisions indicate that loss of the right to arbitration stems only from repudiation of the agreement to arbitrate, not from repudiation of other contractual duties. See, e. g., Grunwald-Marx, Inc. v. Los Angeles Joint Bd., Amalgamated Clothing Workers, 192 Cal.App.2d 268, 13 Cal.Rptr. 446 (1961).

In this context we are faced with the difficult task of discerning the position that would presently be taken by the California courts in regard to appellants' allegations of repudiation. As a preface to deciding this question, it is important to specify carefully the nature of the alleged renunciation. For "repudiation" is an elusive concept, and, as the researcher will find, can have various meanings, often confusing and seldom spelled out. Here, appellants do not contend that appellees have at any time waived or specifically repudiated the arbitration clause itself; indeed, the evidence suggests that appellees have consistently urged compliance with that clause. Rather, the "repudiation" here charged relates to *other* contractual duties. More specifically, the allegations spell out a *refusal to perform contractual obligations*. It is claimed that appellees (1) breached the contract in certain respects,[2] and (2) refused to render any future performance —conduct which, in combination, is asserted to constitute a "repudiation of the contract."

■ Such allegations are to be carefully distinguished from allegations of repudiation through *denial of contractual responsibility*. For the assertion that no contract exists is clearly deemed by California courts to include a denial of the existence of any arbitration agreement, so that one who made such an assertion would be estopped from requiring arbitration. It is upon this basis that Bertero v. Superior Court, 216 Cal.App.2d 213, 30 Cal.Rptr. 719 (1963), much cited by counsel, actually rests. It is clear that appellees here have denied the existence neither of a contract nor, specifically, of the arbitration clause in question.

■ In such circumstances appellees' insistence on arbitration should be upheld. There are several reasons to support this conclusion. First, the rule thus applied—the rule of Heyman v. Darwins, Ltd.—seems the better one. To require, before arbitration, a judicial determination of every allegation that contractual provisions have been "repudiated" would often cause the arbitral process—for which the parties freely bargained—to become valueless, with the very question at issue having already been decided by the "preliminary" judicial proceeding. At the very least, such litigation would bring about an undesirable delay where swift, informal determination had been sought. Further, the requirement cast upon the party alleging repudiation—calling only for him to submit to one method of determining issues rather than another (a method, in fact, to which he had originally agreed)—can hardly be considered oppressive. In this context, the dictum of Lord Macmillan in the *Heyman* decision is persuasive:

"Repudiation, then, in the sense of a refusal by one of the parties to a contract to perform his obligations thereunder, does not of itself abrogate the contract. The contract is not rescinded. It obviously cannot be rescinded by the action of one of the parties alone. But, even if the so-

---

2. Specifically, it is asserted that appellees failed (1) to deliver $18,000 of the $48,000 due appellants over the first two years of the contract; (2) to pay for water produced, saved, and sold; and (3) to build the agreed-upon reservoir and pipelines within two years of the contract's consummation date. The district court up-held appellants' contentions relating to all three breaches in its original decision. This court affirmed with respect to point (1); point (2) was apparently not specifically appealed (no ruling was rendered regarding it); and point (3), of course, now awaits arbitration.

called repudiation is acquiesced in or accepted by the other party, that does not end the contract. The wronged party has still his right of action for damages under the contract which has been broken, and the contract provides the measure of those damages. It is inaccurate to speak in such cases of repudiation of the contract. The contract stands, but one of the parties has declined to fulfil his part of it. There has been what is called a total breach or a breach going to the root of the contract and this relieves the other party of any further obligation to perform what he for his part has undertaken. Now, in this state of matters, why should it be said that the arbitration clause, if the contract contains one, is no longer operative or effective? A partial breach leaves the arbitration clause effective. Why should a total breach abrogate it? The repudiation being not of the contract but of obligations undertaken by one of the parties, why should it imply a repudiation of the arbitration clause so that it can no longer be invoked for the settlement of disputes arising in consequence of the repudiation? * * *

\* \* \* \* \* \*
" * * * It is said to be wrong to allow a party to a contract who has refused to perform his obligations under it at the same time to insist on the observance of a clause of arbitration embodied in the contract. The doctrine of approbate and reprobate is said to forbid this. I appreciate the apparent dilemma, but with the greatest respect I venture to think it is based on a misapprehension. The key is to be found in the distinction which I have endeavoured to draw between the arbitration clause in a contract and the executive obligations undertaken by each party to the other. I can see nothing shocking or repugnant to law in one business man saying to another that he regrets he finds himself unable to go on with his deliveries under a

contract between them and at the same time asking the other to join with him in a reference under an arbitration clause in their contract to ascertain what compensation is to be paid for his default." [1942] A.C. at 373–375. Judge Frank and Professors Corbin and Williston, as well, have offered notable criticisms of the contrary position.[3]

A second reason to support the arbitration provision is California's strong public policy in favor of arbitration and the authoritative language of the relevant state legislation concerning arbitration. The state courts have recognized that:

"It has long been the policy in California to recognize and give the utmost effect to arbitration agreements. As stated in Utah Construction Co. v. Western Pacific Ry. Co., 174 Cal. 156, 159, 162 P. 631, 632: 'The policy of the law in recognizing arbitration agreements and in providing by statute for their enforcement is to encourage persons who wish to avoid delays incident to a civil action to obtain an adjustment of their differences by a tribunal of their own choosing. * * * Therefore every reasonable intendment will be indulged to give effect to such proceedings.' " Myers v. Richfield Oil Corp., 98 Cal.App.2d 667, 671, 220 P.2d 973, 976 (1950).

See also Posner v. Grunwald-Marx, Inc., 56 Cal.2d 169, 14 Cal.Rptr. 297, 363 P.2d 313 (1961).

Also, according to section 1284 of the California Code of Civil Procedure (which, though now superseded,[4] was in effect at the time the Riess-Murchison agreement was made and at the time this litigation was initiated), a stay of proceedings to allow arbitration was required in a situation such as that presented here unless the party urging the stay was "in default in proceeding with such arbitration." Of identical language in a parallel section of the Code—former section 1282, providing for an original

---

3. See authorities cited note 1, supra; 6A A. Corbin. Contracts § 1443 (1962).

4. See present section 1281.4.

action to compel arbitration—the California Supreme Court stated:

"[T]he word 'default,' as used throughout the section, obviously refers only to the 'default' of a party in refusing to proceed to arbitration as agreed rather than to a default by a party under the main provisions of the parties' contract. * * * Any other interpretation of the section would defeat the main purpose of arbitration proceedings, which is to obtain an expeditious hearing and determination by arbitrators of any 'disagreement' which may arise." Weiman v. Superior Court, 51 Cal.2d 710, 712–713, 336 P. 2d 489, 490 (1959).

We see no reason why the virtually identical terms of these two sections dealing merely with separate procedural aspects of the same problem should (or would by the California Supreme Court) be interpreted differently.

The 1961 revision of these sections appears to have changed no more than the language, insofar as their bearing on the present case is concerned. Section 1281.2 of the Code of Civil Procedure now specifies that arbitration is to be ordered unless:

"(a) The right to compel arbitration has been waived by the petitioner; or

"(b) Grounds exist for the revocation of the agreement."

The statutory provisions referred to have, of course, considerable substantive as well as procedural significance.

It is noteworthy, in addition, that at least one of the principal advantages of arbitration which California public policy thus seeks to promote—decision according to skilled arbiters with special knowledge of particular fields—will be advanced by ordering arbitration here; the question of the water lands' capacity would appear to be one as to which technical expertise will be helpful.

In candor, we state that we are given particular pause by one contention made on behalf of appellants. They assert that appellees' alleged refusal to perform was motivated by an expressed desire to injure them by causing delay and giving them "a belly full of litigation." It is tempting to take the position that such conduct warrants treatment different from that accorded one who simply finds himself *unable* to perform his contractual obligations. Nevertheless, we do not conclude that such allegations are decisive. We have discovered no case turning on such a factor. Moreover, it would be an easy matter for any party in appellants' position to allege that a refusal to perform was thus induced; and the litigation required in order to decide the question of motivation would undoubtedly often be substantial, so that (1) still more delay would be interjected into a context in which speedy determination according to arbitration was contemplated by the parties, and (2) judicial inquiry might well so penetrate the issues scheduled for arbitration that the arbitral process would become purposeless. We find some consolation in the fact that one of arbitration's primary advantages is speed, so that the additional delay caused by that process in this unfortunately extended litigation should not be substantial. We conclude, then, that the California courts—which have gained a justified reputation for progressive legal craftsmanship—would resolve this difficult question by reaffirming the language of their more recent decisions and adopting the post-Heyman v. Darwins, Ltd. approach to repudiation in the circumstances of this case.

Since appellees' alleged repudiation is thus irrelevant to the propriety of arbitration, we need not decide the question, urged upon us by appellants, as to whether the record below would support or command a finding of repudiation. Nor need we pass upon appellants' persuasively argued subsidiary contention, that a duty of diligent development of the water

lands by appellees should be read as an implied provision of the contract.[5]

■ Two further questions, with respect to the procedure and order of the district court, remain. Appellants cite Shanferoke Coal & Supply Corp. of Delaware v. Westchester Service Corp., 293 U.S. 449, 55 S.Ct. 313, 79 L.Ed. 583 (1935), for the proposition that the stay ordered by the district court was the equivalent of an interlocutory injunction, and argue accordingly that pursuant to Rule 52(a) of the Rules of Civil Procedure the trial judge should have made and set out separate findings of fact and conclusions of law.[6] This question, however—which is by no means free from difficulty [7]—is one which this court need not decide. Our holding that arbitration is proper regardless of the alleged repudiation in this case makes completely unnecessary detailed findings of fact concerning what assertions were actually made by or on behalf of appellees. As this court noted in Yanish v. Barber, 232 F.2d 939, 947 (1956):

"[N]ot every case, where there is a failure to make findings[,] must be sent back to the district court. * * *

"Moore's Federal Practice (2d Ed.) Vol. 5, states at p. 2662, 'The failure of the trial court to comply with Rule 52, while characterized as a dereliction of duty[,] does not demand a reversal "if a full understanding of the question presented may be had without the aid of separate findings," ' quoting from Shellman v. Shellman, 1938, 68 App.

D.C. 197, 95 F.2d 108, 109, and citing cases."

A remand calling for findings of fact would here be sheer judicial waste, and cannot be countenanced.

■ It is contended finally by appellants that it was error for the district court to include in its order a finding that appellees were not "in default." Appellants apparently construe this language (or fear that it might be construed) to refer to a possible "default" with respect to the substantive provisions of the contract. It seems clear to us, however, that the reference is merely to appellees' conduct in regard to arbitration—that is, to the absence of any action on their part which could possibly be deemed a waiver of the right to arbitration or a failure to pursue that remedy diligently. The issue of "total breach" of the contract remains untried and undecided.

Arbitration, then, is proper with respect to the sufficiency of water to service the Montgomery lands and the additional lands. On the determination of this question hinges the issue of appellees' compliance with their conditional obligation to construct pipelines and a reservoir. The function of the arbitration is thus a narrow one, but the issue involved is an integral part of the broader question whether there has been a "total breach"—which, following arbitration, will presumably be determined judicially.[8]

The order of the district court is affirmed.

5. See, e.g., Hartman Ranch Co. v. Associated Oil Co., 10 Cal.2d 232, 239–242, 73 P.2d 1163, 1166–1168 (1937); Acme Oil & Mining Co. v. Williams, 140 Cal. 681, 74 P. 296 (1903).

6. Accord, Carey v. Carter, 120 U.S.App.D.C. 182, 344 F.2d 567 (1965) (per curiam).

7. See Baltimore Contractors, Inc. v. Bodinger, 348 U.S. 176, 75 S.Ct. 249, 99 L.Ed. 233 (1955); Schoenamsgruber v. Hamburg Am. Line, 294 U.S. 454, 55 S.Ct. 475, 79 L.Ed. 989 (1935).

8. It might be argued that the district court should hear this case before arbitration, on grounds of judicial economy. That is, the district court might conceivably hold that, regardless of whether appellees should be found to have violated their conditional obligation to construct the reservoir and pipelines, there clearly had (or had not) been a total breach; in such circumstances, runs the argument, the appellants might well decline to seek specific damages for breach of that single clause, and arbitration would thus be unnecessary. Cf. Cal.Civ.Proc. Code § 1281.2 (West 1967).

Such reasoning can be justly criticized as overly dependent on speculation. More importantly, however, it ignores this court's prior determination, now the law of the case, that unless their conduct has rendered it improper, "the buyers are entitled to have the question of sufficiency settled by arbitration." 329 F.2d at 644.