Stephan RIESS and Thelma McKinney
Riess, Appellees,

v.

John D. MURCHISON and C. W. Murchison, Jr., Executors of the Will of C. W. Murchison, Deceased, Appellants,

v.

SIMI VALLEY DEVELOPMENT COMPANY, a corporation, Third Party Defendant-Appellant.

No. 72–2528.

United States Court of Appeals,
Ninth Circuit.

Sept. 12, 1974.

Stuart L. Kadison (argued), of Kadison, Pfaelzer, Woodard & Quinn, Los Angeles, Cal., for appellants.

Timothy M. Thornton (argued), of Simon, Sheridan, Murphy, Thornton & Medvene, Los Angeles, Cal., for appellees.

## OPINION

Before CHAMBERS and SNEED, Circuit Judges, and KING,* District Judge.

SNEED, Circuit Judge:

This case is no stranger to this Court. It has been here twice before. Riess v. Murchison, 329 F.2d 635 (9th Cir., 1964); Riess v. Murchison, 384 F.2d 727 (9th Cir., 1969). The initial complaint was filed approximately sixteen years ago, *viz.* on October 8, 1959. It is time to terminate this litigation. To the full extent of our ability and power,

---

* Honorable Samuel P. King, United States District Judge, District of Hawaii, sitting by designation.

the disposition embodied in this opinion is directed to that end.

## I.

### The History of This Litigation.

The issues before us in this third appeal can best be understood by tracing the history which has given rise to them.

A. The First Appeal: Riess v. Murchison, 329 F.2d 635 (9th Cir., 1964)

In our opinion dealing with the present controversy, this Court, speaking through Judge MacBride, outlined the underlying facts, and the legal theories of the parties, in the following manner:

> This is a diversity action involving a land sale contract.
>
> Stephan Riess and Thelma McKinney Riess (referred to herein as the sellers) entered into a contract with C. W. Murchison, who subsequently assigned to Simi Valley Development Company (referred to herein as the buyers) for the sale of certain real estate, namely: A three and one-half acre parcel of land in the Simi Valley in Ventura County, California, on which were located a number of wells (referred to herein as the water lands) and, in addition, approximately three hundred subdivided lots in the same area (referred to herein as the additional lands).
>
> The contract consisted of two separate letters from C. W. Murchison to Stephan Riess, dated September 13, 1955, and June 12, 1956, constituting a single integrated agreement, under which: (1) The sellers were to convey the water lands and the additional lands to the buyers on June 12, 1956, (referred to herein as the consummation date). (2) The buyers were to deliver one-sixth of the common stock of the Simi Valley Development Company to the buyers on the consummation date. (3) The buyers were to pay the sellers $1,000,000 as follows: $50,000 was to be paid on the consummation date. $24,000 was to be paid in each of the two years immediately following the consummation date. No fixed time was set for payment of the balance; it was to be paid at the rate of ten cents per 1,000 gallons of water produced, saved, and sold from the water lands, provided, however, that if during any year the amount payable at this rate should be less than $24,000, the sellers were to be entitled to take the difference in water at the rate of twenty cents per 1,000 gallons, though if the buyers should elect to pay the difference in money, they might do so. (4) 'Subject to' the physical ability of the water on the water lands to adequately service certain other lands which were owned by the buyers and which were to be developed for residential and commercial uses (referred to herein as the Montgomery lands), the buyers were to build or install a reservoir and pipelines on the water lands to transmit water taken therefrom to the nearest boundaries of the Montgomery lands by June 12, 1958. In case of a disagreement as to the sufficiency of the water on the water lands to adequately service the Montgomery lands, the question was to be submitted to arbitration. (5) The buyers were to have the right at any time to reconvey the water lands to the sellers and terminate the contract and their future obligations thereunder, if, in their opinion, the water on the water lands should no longer be capable of producing water in quantities sufficient to be commercially profitable to them.
>
> Pursuant to the contract the sellers conveyed the water lands and the additional lands to the buyers on the consummation date. They have performed all the material covenants and conditions on their side of the contract.
>
> During the fourteen months prior to the consummation date, the buyers paid the sellers $28,000 in fourteen monthly installments of $2,000 each referred to herein as the voluntary payments). The contract recites that this amount should be a 'credit on the purchase price.' On or about the con-

summation date, the buyers paid an additional $50,000 to the sellers, and they delivered one-sixth of the common stock of Simi Valley Development Company to the sellers.

During the fifteen months immediately following the consummation date, the buyers paid the sellers $30,000 in fifteen monthly installments of $2,000 each. Thereafter, the buyers refused to make any further monthly payments, contending that the voluntary payments ($28,000) should be credited against the balance due for the last nine months of the first two year period ($18,000), thereby satisfying such balance and creating an overpayment of $10,000.

Subsequently, during certain meetings between the sellers and the buyers, and in certain correspondence and conversations between them, concerning future performance by the buyers under the contract, the buyers expressed some unwillingness to comply exactly with the terms of the contract. Whether the buyers actually repudiated the contract is in dispute.

The buyers did not build or install the reservoir and pipelines on the water lands by June 12, 1958, as promised, though they did build and install them at a later date before trial. They asserted that the water on the water lands was insufficient to adequately service the Montgomery lands and that, therefore the condition to their duty to build or install the reservoir and pipelines by that date did not occur.

The buyers have not paid the sellers at the contract rate for water produced, saved, and sold by them from the water lands, though between the consummation date and the date of trial they did produce, save, and sell water therefrom.

The buyers have never exercised their right under the contract to terminate the contract for insufficiency of the water on the water lands.

On October 8, 1958, the sellers brought the present action in the District Court. They demanded a jury trial. At trial they proceeded on the theory that the buyers committed total breach of the contract by failing to perform their duties thereunder and by unequivocally repudiating such duties.

Before and during the trial the buyers sought to enforce the contract's arbitration clause. They made a number of motions to stay the proceedings pending arbitration of the question of the sufficiency of the water on the water lands to adequately service the Montgomery lands. . . .

329 F.2d at 637–639.

These motions were denied by the district court. In addition, the court ruled that the contract was not susceptible of total breach, and that "at the times here relevant" only a partial breach had occurred. This partial breach consisted of: (1) the buyers paying only $30,000, instead of $48,000, during the two years immediately following the consummation date; (2) the buyers' failure to build the reservoir and pipelines on the water-lands by June 12, 1958; and, (3) the buyers' failure to pay the sellers at the contract rate for water produced, saved, and sold by them from the water lands. Finally, the district court held that the $28,000 paid prior to the consummation date should be credited "against monies to become due under the contract after trial, not against the $48,000 due during such first two years." 329 F.2d at 639.

On appeal by both Riess and Murchison, this Court framed the issues then before it in the form of three questions. These were:

(1) Did the district court err in ruling as a matter of law that the contract was not susceptible of total breach at the times here relevant?

(2) Should the voluntary payments of $28,000 made prior to consummation date have been credited against $48,000 due under the contract during the first two years after the consummation date?

(3) Did the district court err in holding that the buyers' duty to build

or install the reservoir and pipelines on the water lands by June 12, 1958 was absolute and unconditional and that their failure to build or install them by that date constituted a breach of the contract regardless of the sufficiency of the water on the water lands to adequately service the Montgomery lands?

As to the first question, we overruled the district court on the ground that under California law the contract was not a unilateral contract "for future payments of money only" or "for performances of acts not connected with one another." Nonetheless, we expressly refrained at that time from determining whether the buyers had committed a total breach.

Our response to the second question sustained the district court—i. e., we held that the pre-consummation payment of $28,000 should not be credited against the $48,000 due during the first two years of the post-consummation period. We did not decide the manner in which the $28,000 should be credited against "monies to become due under the contract after trial," *viz.* whether against the monies next due under the contract after trial, against the last such monies due, or in some other fashion.

Finally, we held that the district court erred in treating as unconditional the buyers' duty to build or install the reservoir and pipelines by June 12, 1958. California law, as we perceived it, dictated otherwise. The duty so to build or install had been conditioned upon "the sufficiency of the water on the water lands to adequately service the Montgomery lands." 329 F.2d at 643. From this we reasoned that the district court's denial of the buyers' motions for arbitration, on the ground that the sufficiency of the water was immaterial, had been erroneous. We concluded this first appeal by observing that if the case was one which, under California law, was otherwise proper for arbitration "the buyers are entitled to have the question of sufficiency settled by arbitration." 329 F.2d at 644.

In keeping with the above holdings, we reversed and remanded for further proceedings.

B. The Second Appeal: Riess v. Murchison, 384 F.2d 727 (9th Cir., 1969).

On remand, the buyers moved over objection to refer the question of sufficiency to arbitration. After hearings, the district court ruled that the case was "otherwise proper for arbitration," and ordered the parties so to proceed. We permitted an appeal from this ruling pursuant to 28 U.S.C. § 1292(b) and sustained the district court. In so doing, we held that under California law arbitration pursuant to the contractual provision before us was proper even if the buyers had breached the contract in several respects and had refused to render any future performance solely for the purpose of giving the sellers "a belly full of litigation." We carefully distinguished such alleged conduct from that which occurs when a party denies all contractual liability, which denial under the applicable California law would thereby foreclose that party from later asserting any rights pursuant to an arbitration clause which is contained in the contract.

It is important in describing this second appeal to enumerate the issues which we explicitly stated had been left undecided. We expressly refused to pass upon whether the buyers had repudiated the contract. Nor did we pass upon the contention "that a duty of diligent development of the water lands by appellee should be read as an implied provision of the contract." 384 F.2d at 735, 736. The issue of total breach was left "untried and undecided." *Id.* at 736. We did recognize, however, that the district court's determination in the initial proceedings that the buyers had breached the contract by failing to pay for water produced, saved and sold had not been specifically appealed and thus constituted a portion of the law of the case. *Id.* at 733, fn. 2.

C. The Arbitration Proceedings.

Following our affirmance of the order to proceed with arbitration, a "Stipulation Re Arbitration and Order," dated July 1, 1968, was issued by the district court. This order provided, among other things, that the arbitrators were to take testimony and consider all evidence submitted by the parties only on the following two issues:

(a) How much water would have been necessary on June 12, 1958, on a continuous basis, for a reasonable period of time, to adequately service the lands covered by the Montgomery contract with an adequate supply of water, contemplating that such lands would be developed for residential and industrial uses;

(b) Whether, on June 12, 1958, the well or wells then or thereafter located on the water lands were physically able to produce water, on a continuous basis, for a reasonable period of time, in the quantity determined by the arbitrators to have been necessary pursuant to paragraph [(a) above].

Pursuant to a second order of the district court, also dated July 1, 1968, the buyers were assigned the burden of proof with respect to both of these issues. The arbitrators convened on August 20, 1969 and hearings commenced on December 8, 1969. On May 14, 1970, the arbitrators filed their report, and gave the following response to the question posed in issue (a), set out above:

Not less than 1,750,000 gallons per twenty-four hours, which is, substantially, 1,215 gallons per minute.

Issue (b), also set out above, was answered by the simple word "No."

In an addendum to the report, the arbitrators were careful to set forth their interpretation of certain of the terms which had been employed by the court in framing the issues which they were to consider. "On a continuous basis," for example, was interpreted to require a substantially non-diminishing supply of water for a period of at least 20 years. "To adequately service" meant "normal pressure, normal home use on a year-round basis, shrubbery, fire protection, compliance with County requirements. etc."

The phrase "contemplating that such lands would be developed for residential and industrial usages" was explained by setting forth certain assumptions which the arbitrators had made. For example, a certain density of development was assumed. Of the 1,500 acres potentially available for development, fifteen percent was considered not worth developing. A density of 3.5 houses to the acre generally was assumed, although it was recognized that some of the acreage would be developed less heavily. In addition, it was felt that such development would require 10 years to complete, and only at the expiration of that period would the full 1,750,000 gallons per twenty-four hours be required. However, the arbitrators believed that the water would be inadequate at the end of five years.

In reaching their conclusion that the water would be inadequate at the end of five years, and that a negative response to Issue (b) was warranted, the arbitrators explicitly rejected as not proven the contention of the sellers that the reservoir from which the Riess wells drew water was subject to recharge from a distant source through underground structures. Moreover, even if such recharging took place, the arbitrators felt that any such recharge "would be subject to interception prior to reaching the water lands." The arbitrators then stated:

The estimated available water (rejecting as speculative the distant source theory as unproven), after substantial exhaustion of the stored water now in the underground reservoir which would be exhausted before five years, in the opinions of the three arbitrators, ranges from a sure minimum of 50 gallons per minute to 1,500 gallons per minute. (Mackintosh says 500 is the minimum to which he can agree, but he would put it higher if the distant source theory were proven. Faries put it at 300 per minute and

Mann at 50–150 (He agrees with Mann as a safe business computation)).

## II.

### *The Judgment From Which This Third Appeal Is Taken.*

The arbitration award was confirmed by the district court on September 23, 1970. Thereafter the sellers filed a Fourth Amended Complaint over the objection of the buyers who, in due course, filed an Answer and a Cross-Claim. Trial without a jury commenced on September 20, 1971. The district court regarded this trial as a continuation of initial court proceedings that led to the first and second appeals outlined above rather than a new trial. At the conclusion of this proceeding the district court made, *inter alia,* the following findings of fact which, according to the district court, were to be treated as conclusions of law to the extent they could be denominated as such.

. . . . . .

13. By the Contract above described the parties intended that the Buyers were obligated diligently and in good faith to endeavor to produce as much water as the Water Lands were capable of producing so that such water could be saved and sold.

. . . . . .

20. By conversations which occurred during meetings between Buyers and plaintiffs, and by acts and conduct, the Buyers expressed to plaintiffs their refusal to comply with the terms of the Contract.

21. The Buyers produced, saved, and sold water from the Water Lands between June 12, 1958, and January 28, 1964, but have never accounted to plaintiffs or the Court for the quantity so produced, saved, and sold.

22. On January 28, 1964, although the wells on the Water Lands were capable of further production, the Buyers ceased production from all wells on such lands, and on that date, and thereafter purchased water from the Metropolitan Water District of the City of Los Angeles.

23. The Buyers have never paid the Sellers at the Contract rate or at any rate for any of the water produced, saved, and sold from the Water Lands between June 12, 1958, and January 28, 1964.

24. The Buyers have never exercised or attempted to exercise their right under the Contract to terminate the Contract for insufficiency of the water from the Water Lands.

25. The Buyers never relieved themselves of their obligations under the Contract by reconveying or offering unconditionally to reconvey the Water Lands to plaintiffs, as provided for in the Contract.

26. The Buyers have not paid $48,000 to the plaintiffs as required by the Contract during the two years immediately following June 12, 1956; they have paid a total of $30,000, leaving $18,000 due and owing.

27. The Buyers have failed to keep records of water produced, saved, and sold from the Water Lands as required by the Contract. The Buyers have failed satisfactorily to explain their failure to keep such records.

28. In addition to the contractual obligations pertaining to the accounting and record-keeping requirements of the defendants, the Honorable Harry C. Westover, United States District Judge, in this proceeding, on July 18, 1960, ordered defendants to keep a record of all water produced from the wells of the Water Lands from said date and continuously thereafter. Buyers did not comply with the said order, and have offered no excuse for such noncompliance.

29. On October 18, 1960, in a signed order, the Honorable Harry C. Westover, United States District Judge, ordered that the plaintiffs and defendants were to make available to each other, upon demand, any and all documents relating to water produc-

tion from the Water Lands since the execution of the Contract.

30. Plaintiffs' counsel has made numerous demands on defendants and their counsel for all documents relating to water production from the Water Lands, but neither defendants nor their counsel have ever given plaintiffs a complete accounting or permitted plaintiffs to inspect any records pertaining to water production from the Water Lands, other than one letter dated August 10, 1961, addressed to the Simi Valley Development Company from a third party containing incomplete information; defendants have never offered any reason for such failure.

31. The Buyers have failed to make any accountings to the plaintiffs for the water produced, saved, and sold from the Water Lands as required by the Contract.

32. The conduct of the Buyers' closing down the wells, and failing to keep or to deliver records of water actually produced, saved, and sold during the periods when the wells were in production, has made it impossible for the plaintiffs or the Court accurately to determine the amount of water which the Water Lands in fact produced or which the Water Lands could have produced during the period when Buyers had possession of the Water Lands.

33. The Buyers have failed in good faith to carry out terms of their Contract with plaintiffs, and the Buyers have taken steps to injure plaintiffs' rights and interests in the Contract, as follows:

(a) Buyers have failed and refused to make payments of $2,000 per month during each month of the first two years of the Contract;

(b) Buyers produced, saved, and sold water after the initial two-year period of the Contract, but failed and refused to pay for any water so produced, saved, and sold;

(c) Buyers persistently failed to account to plaintiffs for the water produced, saved, and sold at any time and during any period;

(d) Buyers failed to maintain records showing water produced, saved, and sold; or if Buyers did maintain such records, they failed to produce such records in Court and failed to make such records available to plaintiffs;

(e) After the first 24 months of the Contract, in addition to Buyers' failure to make payments as is found in item (a) of this Finding 33, Buyers failed to make payment in any amount to plaintiffs, either in cash or in water, or to advise plaintiffs of Buyers' election to pay cash or to deliver water;

(f) Buyers failed to maintain the wells on the Water Lands in full operating condition, but on the contrary, neglected them, and in 1964, ceased all production from such wells and lands;

(g) At all times since 1958, Buyers have failed and refused to perform or to recognize their obligations to perform Buyers' obligations under this Contract, except that Buyers have demanded arbitration under this Contract and Buyers have installed certain pipelines and reservoirs (storage tanks).

34. By reason of Buyers' failure to pay to plaintiffs the agreed purchase price, plaintiffs have been damaged and are entitled to recover the sum of $1,000,000, less the sum of $108,000 paid by Buyers to plaintiffs and credited to the $1,000,000 purchase price. The net damage to plaintiffs by reason of Buyers' failure to pay the agreed purchase price is $892,000.

35. There is presently owing to plaintiffs pursuant to the terms of their Contract with defendants a total of $892,000.

In its Memorandum of Decision accompanying these findings, the district

court stated that it had based its analysis on the premise that under the law of the case the buyers had breached the contract in two particulars:

(1) Failure to pay the amounts required to be paid during the two years immediately following the consummation date.

(2) Failure to pay for water produced, saved, and sold up to the filing of the original complaint in 1958.

It further held that the effect of its June 15, 1962 judgment, as modified by the first appeal, was to establish that the above breaches constituted only a partial breach. It stated:

> The court now finds that the judgment of this court, filed June 15, 1962, that there had not been an anticipatory breach but only a partial breach of contract, did not terminate the contract. The contract still exists and is operative, and the parties are bound thereby.

The district court's ultimate finding of total breach was then based on the additional failures to perform set forth in the above findings.

Judgment against the buyers in the amount of $892,000, together with interest at seven percent (7%) per annum from October 8, 1958, was entered on May 25, 1972. Their appeal therefrom is the matter currently before us. We affirm in all respects except as to the proper measure of damages which are recoverable. As to that feature, we reverse the district court's holding and direct that the district court compute the allowable damages in the manner hereinafter described.

The buyers attack the district court's findings and holding on the grounds that they could not have totally breached the contract because any non-performance by them was excused; that the record does not support the conclusion that the contract was totally breached; and that damages were improperly computed. We shall consider each of these contentions.

## III.

### Were Buyers Excused From Performance?

The essence of the buyers' contentions is that the bringing of the suit for total breach of the contract in October 1958 terminated any obligation on their part to perform the contract. They purport to reach this position (1) by asserting that the sellers, by bringing suit in 1958, elected to treat the contract at an end and "thereafter seek redress through the medium of litigation;" and (2) by insisting that they justifiably relied on this election to their detriment.

Their argument can best be understood by casting it in hypothetical form. Assume S conveyed Blackacre to B in exchange for B's promise to farm Blackacre and to pay S an annual sum, equal to one half the gross value of the crops derived therefrom for a period of ten years, or until the sum of $50,000 had been paid, whichever occurs first. Following his conveyance, S became dissatisfied with B's methods of farming and the amounts he was receiving. S brought suit against B alleging a total breach of the contract by B and seeking to recover damages in an amount equal to the present value of B's entire future performance. B responded by denying that a total breach had occurred and that the breach, if any, was only partial. In the course of the litigation, it was determined that B was correct as of the date suit was initiated—i.e., only a partial breach had occurred. During the pendency of the litigation, B did not repudiate the contract but ceased all performance and retained Blackacre. It is the contention of the buyers in this case that B is entitled to cease such performance, retain the land, and be liable thereafter in damages only for the partial breach.

This should not be the law; nor do we think that it is the law. The line between a partial and a total breach is not so plain as to visit such a severe forfeiture upon a plaintiff who exaggerates his injury. Under the circum-

stances of our hypothetical, it was the duty of B to continue his performance or to offer to restore S substantially to his antecedent position. Failure to do either amounts to a total breach by B which entitles S either to amend his complaint to include a prayer for relief with respect to such breach or, if the case has proceeded to final judgment in which only damages for partial breach have been recovered, to bring a new suit seeking damages for the total breach. In this latter case, the initial proceeding is not *res judicata;* the second suit is upon a different and distinct injury.

It must be acknowledged that we have been able to find no precise precedent in the law of California, or elsewhere, for either the position we believe is correct or for that insisted upon by the buyers. We cannot believe that a doctrine as novel and as harsh as that advocated by the buyers would have escaped the attention of the courts of California or that of commentators. This silence reassures us.

The buyers press upon us authorities which assert that a party aggrieved by a breach of contract may not simultaneously pursue inconsistent remedies for relief. Alder v. Drudis, 30 Cal.2d 372, 182 P.2d 195 (1947), for example, so holds. Authorities such as *Alder* recognize that, following a total breach unaccompanied by a repudiation of the contract by the wrongdoer, the aggrieved party has a choice of three courses of action. He may treat the total breach as a partial breach and insist upon further performance by the wrongdoer; he may assert a total breach and seek damages measured by the value of what he would have received had the contract been performed; or he may seek restitution in which both he and the wrongdoer will be restored to the position they occupied at the time the contract was formed. He cannot recover both damages for a total breach *and* obtain restitution, the vice which led the Supreme Court of California to reverse the trial court's judgment in *Alder.* The choice between damages and restitution is

forced to avoid placing the aggrieved party in a better position than he would have been in had the contract been performed. *See* 5A Corbin on Contracts, § 1223 (1964). It serves the same purpose as does the rule that the injured party cannot at the same time receive a decree for specific performance and a judgment for damages based on a total breach. *See* 5A Corbin on Contracts, § 1222 (1964).

■ Usually the necessity of a choice of remedies, which inescapably arises only immediately prior to judgment, is described as an "election" in which the injured party either treats the contract as "in existence" and seeks damages for its breach or "rescinds" the contract and seeks to be restored to the *status quo ante.* Any necessity to elect at an even earlier date must rest upon facts which estop the injured party from altering his choice of remedies because the breaching party has made a substantial change of position in reliance upon the injured party's initial choice. This is well settled California law. Roullard v. Rosenberg Bros. & Co., 193 Cal. 360, 224 P. 449 (1924). *See* Corbin on Contracts § 1220 (1964).

■ These principles provide no support for the buyers' assertion that the sellers' initiation of this suit in 1958 for total breach of the contract amounted to an "election" to treat the contract at an end, and that this "election" thereby relieved the buyers of any obligation thereunder. The buyers were not misled in a way that makes consideration of their failure to perform subsequent to 1958 inequitable or unjust. Our rather lengthy recital of the history of this litigation amply makes clear that they not only used water from the Riess wells but also insisted for purposes of arbitration that the contract was not extinguished by commencement of this suit. Moreover, we find nothing in the record that could lead the buyers to believe that the sellers did not expect them to continue performance under the contract. It is true, of course, that the buyers were entitled to insist upon arbitration and to

defer the construction of the reservoir and pipelines until that had occurred; but in other respects the contract remained binding upon them. Full performance by the sellers already having occurred, the filing of this suit could not foreshadow a failure by the buyers to receive the consideration for which they had bargained.

■ The buyers also insist that they were justified in relying on the sellers' refusal to accept various proposals, which had been put forward by the buyers prior to the commencement of this suit, as evidence of an intention to treat the contract at an end. As we read the applicable testimony, these proposals, designed to facilitate a settlement of the dispute on terms generally favorable to the buyers, were rejected by the sellers who insisted upon either full performance or complete restitution. Rejection of an offered accord provides no basis for assuming that the offeree no longer asserts his rights under the contract. That he does so assert his rights is the overwhelming inference.

■ Nor are we impressed by the buyers' insistence that the sellers' reluctance to accept settlement terms offered by the buyers, and their resistance to efforts by the buyers to obtain arbitration, constituted a breach of the contract which would excuse the buyers from further performance. The sellers, as this Court recognized on the first appeal of this case, "have performed all the material covenants and conditions on their side of the contract." In 1958 the contract was executory only with respect to the buyers. Putting aside any residual implied covenants of cooperation to which the sellers might remain obligated, only the buyers could fail to perform in accordance with the terms of the contract. Moreover, any such implied covenants were not breached by the sellers' insistence upon their interpretation of the contract, including their views with respect to arbitration which, it must be remembered, were resolved against them only after the second appeal to this Court. *Cf.* 4 Corbin on Contracts, § 973.

Cooperation, not surrender, is the outer limit of any possible executory duty to which the sellers remained liable at the commencement of this suit. We cannot find that this duty has been breached or repudiated.

The strongest argument made by the buyers to support their contention that their duties under the contract were terminated when this suit was filed in 1958 rests upon their interpretation of Coughlin v. Blair, 41 Cal.2d 587, 262 P.2d 305 (1953). They point to certain language in one portion of the opinion which dealt with the issue of whether a wrongdoer who has totally breached a contract could reduce his damages by receiving a credit for that portion of his performance which was rendered subsequent to the filing of the injured party's suit but prior to trial thereof. In treating this issue, the court stated as follows:

> Ordinarily this question does not arise. If the injured party accepts or urges performance by the promisor, he will not be allowed to obtain damages on the theory that performance has not been made. If the wrongdoer cannot induce the injured party to accept performance, he will ordinarily not perform. The record does not show why defendants chose to continue performance after the action was brought. Plaintiffs did not urge performance after the complaint was filed, and they could not prevent it. By commencing the action they fully and fairly informed defendants that instead of performance they sought money damages for the value of defendants' promise. Unless plaintiffs indicated that they were again willing to treat the breach as partial, the remedial rights provided by law were substituted for the rights under the contract. Restatement, Contracts, § 313, Comment c. Thereafter defendants were absolved from all duties under the contract to furnish improvements. Subsequent work to that end would not be performance of a contract then existent but would be entirely voluntary. If prompted by defendants' self inter-

est in the sale of other lots, such gratuitous benefit, wholly speculation on the record, would not constitute unjust enrichment to plaintiffs. Parties who have totally breached a contract cannot force performance on the injured parties.

41 Cal.2d at 602–603, 262 P.2d at 314.

The buyers appear to suggest that under the above language they were justified in believing that with the filing of the suit in 1958 the sellers had indicated that they would accept nothing but damages for a total breach, and that this belief led the buyers to eschew further performance under the contract. In this manner they relied, reasonably they assert, on the sellers "election" of remedies and prudently failed to render further performance for which they could receive no credit in the final assessment of damages. By this process of reasoning, buyers attempt to establish the "estoppel" basis of the election of remedies referred to earlier.

While we are not at liberty to reject the holding of Coughlin when confronted with a substantially similar situation in a diversity case governed by California law, neither are we required to extend this case beyond its facts. As we see it, such an extension is what the buyers are urging. There are two principal distinctions between the facts of this case and those of Coughlin. The first is that in Coughlin neither party seriously questioned the existence of a total breach by the wrongdoer prior to commencement of the suit. Nor did subsequent litigation prove this assumption erroneous. Thus, without regard to whether credit for post-suit performance is allowed, the plaintiff in Coughlin was assured the recovery of damages for a total breach. To apply Coughlin here in the manner sought by the buyers would limit the recovery by the sellers to damages for a partial breach even though the sellers fully performed and the buyers substantially failed to do so. No case from California, or elsewhere, which applies Coughlin in such a context has been called to our attention.

The second distinction is that, notwithstanding the total breach in Coughlin, the injured party treated the breach as partial for approximately one year during which time he urged the wrongdoer to perform. Despite this opportunity to expunge the total breach, the wrongdoer failed to fulfill his contractual duties. Coughlin merely terminated this extended opportunity to perform fully. In the instant case there was no total breach in 1958 which could be expunged; there was only a partial breach coupled with a dispute about the sufficiency of the water and the applicability of the arbitration clause. While Coughlin permits an injured party who has fully performed to terminate the period of grace that he has extended, it does not require that one whose defective performance is incorrectly described as a total breach should thereafter be excused from all further performance.

These distinctions make clear that we are not required under California law to disregard buyers' total breach of the contract subsequent to the commencement of this suit because of the sellers' institution of an action for total breach in 1958. We have examined carefully all the authorities relied upon by the buyers to support their interpretation of Coughlin and find none of them persuasive.

■ It should be obvious that in our analysis of the buyers' claim that they were excused from performance we have proceeded on the assumption that at the time this suit was commenced the contract had only been partially breached. The district court so held and we agree. However, the final result which we reach in this case would be no different even if we had considered the buyers to have been in total breach in 1958. This follows because damages for total breach must be fixed by reference to what the aggrieved party would have received had the contract in its entirety been performed. Where, as in this case, the performance of the defaulting party is to extend over a long period of time, such damages may be far different from what might

be due and owing the injured party, under the terms of the contract, as of the date the total breach occurred. In computing such damages, the true issue of *Coughlin*—i. e., the availability of a credit for any performance rendered subsequent to the filing of a suit seeking damages for total breach—might arise; but in all events the injured party is entitled to the economic equivalent of full performance. Anything less is inadequate reparation.

## IV.

### Did Buyers Totally Breach?

The buyers insist that, even if not excused from performance on the grounds just discussed, their contract with the sellers was never totally breached. To support this contention they assert that they did not repudiate the contract, that no evidence of any such repudiation exists, and that at no time has either the district court or this Court so held. We are inclined to agree. However, the absence of repudiation is not dispositive given that, in our view, the contract before us was totally breached by nonperformance.

The buyers argue that there could be no total breach by nonperformance because the arbitration proceedings established that the Riess wells were not physically able to produce water, on a continuous basis, to adequately service the Montgomery lands. They contend that this determination relieved them of any duty to construct a reservoir and pipelines, to produce, save, and sell water, and to perform any other duty imposed upon them by the contract. This overstates the effect of the arbitrators' findings.

Our approach to this issue requires that the situation which existed prior to the filing of this suit be examined. At that time the buyers had developed doubts about the capacity of the Riess wells to produce the quantities of water they originally had anticipated. Notwithstanding these doubts, they did not avail

themselves of paragraph 8 of the September 13, 1955 letter agreement which provided:

> 8. In the event I shall acquire from you the Water Lands as herein provided for and at anytime thereafter such lands, or rather wells located thereon, shall no longer be capable of producing commercially pure water in commercial and paying quantities then at my option I may re-convey to you the Water Lands and thereby relieve myself of any further obligations under paragraph 2(b) hereof save and except for the payment of any then accrued but unpaid sums payable to you under said paragraph 2(b). If I should exercise the rights accorded me under this paragraph I shall have the right to salvage and remove from the Water Lands all fixtures, improvements and personal property located thereon owned by me. Also if I should exercise such rights I shall not be responsible or liable to you for the condition of any wells located on said Water Lands.

Nor did the buyers respond to the sellers' initiation of this action in 1958 by offering to rescind the contract. Instead, water was produced, saved, and sold from the Riess wells from the time of their acquisition by the buyers until January 28, 1964.

It is our view that the district court was correct in holding that the buyers "were obligated diligently and in good faith to endeavor to produce as much water as the Water Lands were capable of producing so that such water could be saved and sold." This implied obligation of "good faith" may well have been constructively conditioned upon the physical capacity of the Riess wells to service the Montgomery lands initially; but the buyers continuing performance of the contract, albeit defective in substantial respects, by producing, saving and selling water and constructing certain reservoirs, and pipelines effectively waived this constructive condition.[1] As

---

1. If it were true, as the buyers strenuously argue, that the sufficiency of the water to

service the Montgomery lands was an absolute condition precedent to *any* duty to produce,

a result, while the duty to erect the reservoir and pipelines contemplated by the contract was excused as a result of the arbitration, the implied covenant to endeavor in good faith to produce was not. The buyers' failure to perform a substantial part of their duties under this covenant is the heart of their total breach.

This implied covenant to endeavor in good faith to produce, save, and sell water is firmly rooted in California law and in the decisions of this Court. While it is true that under California law implied covenants are limited to those terms "which are necessary to make a contract reasonable, or conformable to usage," California Civil Code, § 1655, and not inconsistent with other provisions of the contract, the decisions of California courts, even when refusing to find an implied covenant insisted upon by one of the parties to a contract, acknowledge that there exists an implied covenant to perform in good faith on the part of both parties to a contract. *See e. g.*, William S. Gray & Co. v. Western Borax Co., Ltd., 99 F.2d 239, 242 (9th Cir., 1938) (applying California law); Langenberg v. Guy, 77 Cal.App. 664, 669, 247 P. 621, 623 (1926). *See generally* 1 Witkin, Summary of California Law, Contracts, § 242 (7th ed.).

The obligation to endeavor to perform in good faith in the context of the contract before us requires that the buyers endeavor in good faith not only to produce, save and sell water but also to account properly therefor.

Although the authorities which imply covenants to develop and to market in mineral leases are not directly applicable to this case, the readiness with which such covenants are implied suggests to us that implying the covenant to endeavor in good faith to produce, save, sell, and account does not run counter to the intent of contracts, such as this, pertaining to the extraction of natural resources from the earth. *See generally* 5 Williams & Myers, Oil & Gas Law, (Implied Covenants) (1972).

## V.

### *Were Damages Computed Improperly?*

■ As already indicated, we believe the district court erred in computing damages. It treated the contract between the sellers and buyer as a contract for the sale of land for the price of $1,000,000. *See* Finding of Fact No. 34, *supra* at 12. This is an erroneous construction of the contract. Paragraph 2(b) of the contract, set forth in the margin[2] and heretofore described in the

---

save and sell, then they would have been required to assert their freedom from liability at the time the inadequacy became apparent and offer to make payment in accordance with the contract to the extent that they had received benefits thereunder. However, even accepting, *arguendo*, the buyers' contention that there existed no implied good faith obligation to produce, save and sell, buyers' construction of a limited reservoir and pipeline coupled with their continuing use of the wells would operate as a waiver of the express condition. *See, e. g.*, Sitlington v. Fulton, 281 F.2d 552 (10th Cir., 1960); Foster v. L.M.S. Development Co., 346 S.W.2d 387 (Tex.Civ. App.1961); John B. Robeson Associates, Inc. v. Gardens of Faith, Inc., 226 Md. 215, 172 A.2d 529 (1961).

If, on the other hand, buyers were to argue that no waiver occurred by their continuing to produce, save and sell because such action was contemplated by the contract whether or not the express condition arose, *see* 3A Corbin

on Contracts § 755, then, even absent an implied obligation to produce in good faith, the failure to account and pay for the water so taken would constitute material breach of the contract.

2. Paragraph 2(b), as amended, reads in full as follows:

2(b) I shall pay to you and your wife the sum of $1,000,000 of which $50,000 will be paid to you and your wife in cash at the time of the consummation of the sale by you and the purchase by me of the lands herein provided to be sold and conveyed by you to me. The balance, to wit: $950,000, shall be payable at the rate of ten cents ($0.10) per one thousand (1,000) gallons of water produced, save and sold from the Water Lands, however, for the first two year period from the date of the consummation of the purchase of the lands herein provided to be purchased by me from you, I agree to pay you a minimum amount of $24,000 per year

first appeal, obligates the buyers to pay at "$0.10 per one thousand (1,000) gallons of water produced, saved and sold from the Water Lands" and not otherwise. It is true, of course, that both the sellers and buyers had certain options in the event the payments subsequent to the first two years of the contract did not amount to $24,000; but the fact remains that payments were to be measured by the water produced, saved, and sold.

It is likely that the district court's erroneous interpretation of the contract was influenced by the fact that the buyers have steadfastly refused to account for the water they did produce, save, and sell in any satisfactory manner and have made no effort to justify their termination of the use of any water from the Riess wells on January 28, 1964 other than to admit that other water became available at that time. This is not enough to relieve them of their "good faith" obligation. Faced with such contumacy the district court's reaching for some simple basis upon which to rest damages is understandable.

In our judgment, the district court should have turned to the finding of the arbitrators. These findings demonstrate clearly to us that sufficient water never existed to yield to the sellers the balance of the one million dollars provided by the contract. Damages should have been computed on the basis of what the sellers would have received had the buyers in good faith produced, saved, and sold that amount of water of which the Riess wells were capable of producing.

■■■ While it is a close question whether the findings of the arbitrators. alone furnish sufficient data upon which to so measure damages, we believe that the interests of justice will be best served by treating this data as sufficient. *See, e. g.,* Steelduct Co. v. Henger-Seltzer Co., 26 Cal.2d 634, 160 P.2d 804, 813 (1945); Bertero v. National General Corp., 254 Cal.App.2d 126, 62 Cal.Rptr. 714, 729 (C.A.1967); Pacific Scientific Co. v. Glassey, 245 Cal.App.2d 831, 54 Cal.Rptr. 235, 243 (C.A.1966). *See generally* Baver, "The Degree of Moral Fault as Affecting Defendant's Liability," 81 U.Pa.L.Rev. 586, 592 (1933). Proceeding in this manner, we direct that damages be computed on the assumption that the Riess wells could produce water for 20 years commencing June 12, 1958. We further direct that it be assumed that during the period 1958 thru 1963 the production could and

whether or not any water is produced, saved and sold from the Water Lands. Thereafter, however, my obligation for the payment of the balance of said $950,000 shall be limited to an amount, to be accounted for monthly or quarterly (as we may agree) equal only to ten cents ($0.10) per one thousand (1,000) gallons of water produced, saved and sold from the Water Lands but with the proviso and understanding that if during any accounting year the aggregate amount payable to you under this arrangement shall be less than $24,000 and I shall not elect to make payment of any such difference than at your option and upon your giving me thirty days prior written notice I will deliver to you during the then current accounting year at the well head of any one or more of the wells located on the Water Lands free of cost to you at the times and in the quantities specified by you in writing from time to time such quantities of water as you may prescribe up to a total of that many gallons of water multiplied by twenty cents ($0.20) [per thousand gallons] as will equal the difference between the sums paid or payable to you for the preceding calendar year and $24,000, subject, of course, to the physical ability of the wells upon the Water Lands to produce such quantities and to temporary failures and delays due to causes of force majeure. In the event I should elect to make payment of any such deficiency in said $24,000 for any accounting year then it is agreed that if for the next accounting year you shall be entitled to receive in excess of $14,000 I shall be allowed a credit for such amount of the excess for such next accounting years, but not otherwise, up to the amount of the deficiency so paid by me with respect to the preceding accounting year. This shall be on an accounting year to year basis and shall not be cumulative from accounting year to year.

should have been at 300 gallons per minute twenty four hours a day, and that for the balance of the twenty year term production could and should have been at 150 gallons per minute twenty four hours a day.

Against this amount so computed should be applied as a credit the voluntary payment of $28,000, which we hold under the circumstances of this case should be applied at the end of the payments for water. For this reason the credit of $28,000 should not be augmented by the accrual of interest. The unpaid $18,000, representing payments not made during the two years following the consummation date, should also be recovered, but with allowance for proper interest. The assumptions upon which we base these directions are largely derived from the addendum to the report of the arbitrators, which we regard as evidence properly before us, and represent our fairly conservative application of their estimates of the capacity of the Riess wells.

With respect to the computation of damages, we reverse the judgment of the district court and remand for the sole purpose of computing damages in accordance with the above assumptions. Such computation should utilize an interest and discount rate of 7 percent per annum. Interest or sums determined to be due and owing with respect to water which could and should have been produced, saved, and sold should be computed from the first day of each year next succeeding that in which the water should have been produced, saved, and sold. Thus, the interest due on sums owing because of water which could and should have been produced, saved, and sold during 1958 shall be computed from January 1, 1959, that during 1959 from January 1, 1960, etc. Interest on the payments not made during the two years following the consummation date, *viz.* $18,000, shall be computed from the dates such payments were due.

Affirmed in part and Reversed in part.