Joe **OHASHI**, Plaintiff and Appellant,

v.

**VERIT INDUSTRIES**, a corporation, et al., Defendants and Appellees.

No. 74–2027.

United States Court of Appeals, Ninth Circuit.

May 25, 1976.

Ralph R. Scott (argued), Los Angeles, Cal., for appellant.

Thomas M. Norminton (argued), Beverly Hills, Cal., for appellee.

## OPINION

Before BARNES and HUFSTEDLER, Circuit Judges, and SKOPIL,* District Judge.

HUFSTEDLER, Circuit Judge:

Ohashi appeals from the dismissal of his damage claims for failure to state a claim for relief under the federal securities laws (Securities Exchange Act of 1934, § 10(b), 15 U.S.C. § 78j(b), and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5) and for want of jurisdiction of the common law tort claims. The defendants are Verit Industries, a corporation ("Verit"); three of its directors and officers, Hagopian, Clabaugh, and Cobb; United States Stock Transfer Corporation ("Stock Transfer") and its president, Marshall.

The district court held that the *Birnbaum* rule (*Birnbaum v. Newport Steel Corp.* (2d Cir. 1952) 193 F.2d 461) barred relief under Section 10(b) and Rule 10b–5; with the demise of the federal claim, the pendent state claims were also dismissed.

We agree with the district court's disposition of all theories of federal securities relief, save one: Verit's fraud was alleged to have impaired the consideration for the exchange of securities after the securities had been transferred to Ohashi, but while the contract was still executory. That alleged fraud was "in connection with the purchase or sale of any securities" within the meaning of Section 10(b) and Rule 10b–5. The complaint adequately pleaded enough facts to withstand the motion to dismiss filed by Verit, Hagopian, Clabaugh, and Cobb on this theory.

In substance, the pleadings recited the following facts, the truth of which is presently assumed. Ohashi was the majority stockholder of Commerce-Pacific, Inc. ("Commerce") when Tanger Industries (now Verit) undertook to acquire Commerce in 1968. Ohashi's Commerce stock was then worth about $300,000. As a part of the acquisition agreement of May 13, 1968, Ohashi exchanged his Commerce stock for shares of Verit's $1 par common stock. Although Verit's common stock was being publicly traded, the shares issued to Ohashi were not registered with the SEC; that block of stock was issued pursuant to the private offering exemption of Section 4(2) of the Securities Act of 1933. (15 U.S.C. § 77d(2).) An integral part of the exchange agreement was the provision requiring Ohashi to execute an "Investment Letter" wherein he agreed not to transfer his Verit shares until (1) he had given a detailed

* Honorable Otto Skopil, Jr., United States District Judge, District of Oregon, sitting by designation.

statement of facts surrounding the proposed transfer to Verit, and had received a written opinion from Verit's counsel stating that the proposed transaction would not violate federal securities regulations, or (2) he had received a "no action" letter from the SEC. The following legend and transfer restriction was placed on his shares:

"No sale, offer to sell or transfer of the shares represented by this certificate shall be made unless a registration statement under the Federal Securities Act of 1933, as amended with respect to such shares is then in effect or an exemption from the registration requirements of such Act is then in fact applicable to such shares."

Verit instructed its transfer agent, Stock Transfer, that none of Ohashi's stock could be sold, offered for sale, or transferred without Verit's express authorization.

From December 1970, until January 1972, Ohashi repeatedly inquired about removal of the restrictions and was falsely assured by the Verit defendants that removal was imminent or that they were taking appropriate steps in that direction. In November 1971, Ohashi sent Verit a "no action" letter from the SEC. The Verit defendants continued their inaction and false assurances of their intent to perform. When relief was still not forthcoming, Ohashi was coercively induced to enter an escrow agreement in January 1972, whereby he agreed to removal of the restrictions on a piecemeal basis. Ohashi avers that all of these misrepresentations were made to further a conspiracy among the defendants to keep Ohashi's stock off the market and thereby to limit the "public float" of Verit's stock for the purpose of artificially raising the price of the publicly traded stock. The restrictions were removed on January 12, 1972, but, by that time, the defendants' manipulations of publicly traded Verit stock were under investigation which culminated in the SEC's suspending trading in Verit on May 18, 1972.

During the period from August 1, 1972 to October 31, 1973, Ohashi sold about one-third of his Verit stock to third persons. At the time he acquired his stock, Verit common was trading at $14 per share, but when he sold it, the price had fallen to $1.50 per share.

For claimed fraud in connection with the purchase and sale of securities, he sought compensatory and punitive damages and attorney's fees.

■ The district court correctly held that Ohashi could not state a Section 10(b) or Rule 10b–5 claim based on his inability to sell or offer to sell his Verit stock to third persons, even if his inability was caused by defendants' fraudulent or deceptive acts. As to these nonsales, Ohashi was neither a buyer nor a seller of securities, and the *Birnbaum* rule foreclosed his claim. (*Blue Chip Stamps v. Manor Drug Stores* (1975) 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539.)

■ Likewise correct was the dismissal of his Section 10(b) and Rule 10b–5 claim based on the diminished value of the stock that he sold to third persons. He was a seller of that stock, but the complaint fails to make any showing that connects any of the alleged fraudulent activities to these sales. The deceptive conduct involving his shares occurred between June 1, 1971, when the restrictions were supposed to be removed and January 12, 1972, when the restrictions were removed. His sales did not occur until August 1, 1972, and thereafter. He did not claim that he sold his shares for less than their market value at the time of the sales. Rather, his theory is that the market value of the stock would have been much higher if the value of all of the Verit stock, including his own, had not been impaired by the wrongful conduct that had occurred before January 12, 1972. Recovery on this theory is also foreclosed by the *Birnbaum* rule. (*Birnbaum v. Newport Steel Corporation, supra.*) As the Supreme Court explained in *Blue Chip Stamps, supra*:

"Three principal classes of potential plaintiffs are presently barred by the *Birnbaum* rule. . . . Third are shareholders, creditors, and perhaps others related to an issuer who suf-

fered loss in the value of their investment due to corporate or insider activities in connection with the purchase or sale of securities which violate Rule 10b–5. It has been held that shareholder members of the . . . third of these classes may frequently be able to circumvent the *Birnbaum* limitation through bringing a derivative action on behalf of the corporate issuer if the latter is itself a purchaser or seller of securities." (*Blue Chip Stamps v. Manor Drug Stores, supra*, 421 U.S. at 738–39, 95 S.Ct. at 1926.)

Ohashi is within the "third class" in respect of his own sales, and he cannot circumvent *Birnbaum* in this action. It does not purport to be a derivative suit.

One theory remains: Was there fraud "in connection with" the acquisition of received Verit stock that he in exchange for his Commerce stock?

If the exchange had been fully executed upon Verit's issuance of its stock to him and his transfer to Verit of his Commerce stock, the answer would be "No." Ohashi does not contend that the defendants fraudulently induced the exchange or that any fraud tainted the initial restrictions placed upon his Verit stock. The fraud of which he complains occurred after the exchange; the subsequent illegal conduct was not in connection with the inducement nor concurrently with the exchange.

However, if the contract by which Ohashi acquired Verit stock was still executory when the fraudulent activities occurred and if those acts affected the unperformed part of the bargain, the fraud may be "in connection with the sale or exchange of any securities." If the contract was still executory, a sufficient contractual relationship existed. It is clear by our prior decision in *Mount Clemens Industries, Inc. v. Bell* (9th Cir. 1972), 464 F.2d 339 that "the existence of a contractual relationship between the parties [is an essential element to elevate] the plaintiffs to the status of statutory purchasers or sellers." (*Id.* at 345.) We turn to the law of California, where the contract was made, to decide whether the contract was executory and then to federal law to ascertain whether the alleged fraud was in connection with the exchange of securities.

Under California law, every contract contains an implied covenant of good faith and fair dealing whereby no party will do anything to injure the right of any other to receive the benefits of the agreement, and each will do everything that the contract presupposes that he will do to bring the bargain to fruition. (*Crail v. Blakely* (1973) 8 Cal.3d 744, 749–50, 106 Cal.Rptr. 187, 191, 505 P.2d 1027; *Berkeley Lawn Bowling Club v. City of Berkeley* (1st Dist.1974) 42 Cal.App.3d 280, 286–87, 116 Cal.Rptr. 762, 766.) The exchange contract presupposed that Ohashi could not receive the full benefit of his bargain until the transfer restrictions were lifted. But Verit could not permit removal until a transfer of Ohashi's Verit stock would not place it in danger of violating the Securities Act of 1933. Under the private offering exemption, the stock issued to Ohashi was not registered, and if the terms of the exemption were not met, Verit would have been in violation of the Act. The removal of the restrictions could not legally have occurred for a substantial period of time; it was anticipated that the condition would not be met until 1971. Although Verit did not have any express contractual duty to remove the restrictions, its cooperation was necessary to permit removal as soon as feasible. Under these circumstances, Verit's implied covenant of good faith continued and the exchange contract remained executory (*see* 1 B. Witkin, Summary of California Law § 6 (8th ed. 1973), *but see* 1 Williston on Contracts § 14 (3d ed. 1957)) until the restrictions were removed, or until they could have been removed with the cooperation of Verit. (*Cf. Riess v. Murchison* (9th Cir. 1974) 503 F.2d 999, 1011–12.) Thus, the exchange contract was still executory at least until sometime in 1971, and, perhaps, later.

The alleged false representations by Verit, acting through Hagopian, Clabaugh, and Cobb, relating to the acts done by Verit to

remove the restrictions and with respect to Verit's intentions in acting to remove them were made between December 1970, and January 12, 1972. At this stage of the pleading, we cannot ascertain whether all or some of the misrepresentations were made while the contract was alive, that is before the restrictions were or could have been removed.

■ Not every failure to perform a contractual covenant in a contract to sell or exchange securities can become a basis for a claim that a defaulting party has employed a "device, scheme, or artifice to defraud" within the meaning of Rule 10b–5, let alone a claim for common law fraud.[1] "[W]hether there is actionable fraud or a mere breach of contract depends on the facts and circumstances developed at the trial or on motion for summary judgment." (*A. T. Brod & Co. v. Perlow* (2d Cir. 1967) 375 F.2d 393, 398.) Especially is this observation true in a situation like this one in which it is alleged that active misrepresentations were made to Ohashi and market manipulations were wrongfully undertaken as an accompaniment to nonperformance of the implied covenant. (*Cf. Allico National Corp. v. Amalgamated Meat Cutters and Butcher Workmen of North America* (7th Cir. 1968) 397 F.2d 727; 1 A. Bromberg, Securities Law: Fraud, § 4.6(230), at 82.1 (1975).)

■ The alleged misrepresentations of Verit and Verit's named officers and directors were made in connection with the still executory covenant of good faith and fair dealing in the 1968 exchange agreement. These averments together with the asserted detriment to Ohashi were enough to withstand Verit's and its directors' and officers' motion to dismiss Ohashi's Section 10(b) and Rule 10b–5 claim.

However, the defendants' attack upon the complaint for deficiencies in the damage averments is well taken. As presently drafted, the complaint does not specifically relate the alleged fraud in connection with the 1968 exchange to identified out-of-pocket loss suffered by Ohashi as a consequence of the fraud. (*Estate Counseling Service, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (10th Cir. 1962) 303 F.2d 527. *See Sackett v. Beaman* (9th Cir. 1968) 399 F.2d 884, 891.) We have no reason to believe at this time that these defects cannot be cured by amendment on remand.

Nothing we have said saves any federal claim against United States Stock Transfer Corporation or its president, Robert O. Marshall. These defendants were not parties to the exchange agreement, and no act of theirs is alleged that tied them into any deception or unfair dealing in connection with that exchange. The federal claim and the pendent state claims were correctly dismissed against them.

The order dismissing the complaint against United States Stock Transfer Corporation and Robert O. Marshall is affirmed, and they shall have their costs on appeal.

■ The order dismissing the claims against Verit, and the individually named officers and directors of Verit, is affirmed in part, reversed in part, and remanded to the district court for further proceedings consistent with the views herein expressed.[2] These parties and Ohashi shall each bear their own costs on appeal.

SKOPIL, District Judge (dissenting):

I must respectfully dissent.

The existence of a contractual relationship is crucial to plaintiff's federal cause of action. As the majority recognizes, its decision is correct only if the 1968 exchange contract was still executory when the alleged fraud occurred. Clearly, an express agreement by Verit to remove the stock transfer restrictions would have rendered

---

1. A.L.I., Restatement (Second) Torts §§ 525–45A (Tentative Drafts 10, 1964 & 11, 1965).

2. Because we find the securities law claim does not fail to state a claim, the district court retains its pendent jurisdiction over the state law claims against Verit and its officers and directors.

the contract executory. But the contract contained no such agreement. The *express* terms of the contract had already been fully performed when the alleged fraud occurred. Even acknowledging that every contract contains an implied covenant of good faith and fair dealing, I do not believe that any *implied* duty sufficient to make the contract executory exists under the facts of this case.

I would affirm the decision of the district court.